Davis, Judge,
delivered the opinion of the court:
Plaintiff, a non-veteran, was an employee of the Federal Government from 1939 until August 1954. In December 1953 he was injured in an automobile accident while performing official duties. After hospitalization and treatment, plaintiff returned to work in early 1954 and continued in his position as a deputy tax collector of the Jackson, Mississippi, Field Division of the Internal Revenue Service. Effective August 26, 1954, plaintiff was removed for cause. On appeal, the Commissioner of Internal Revenue affirmed the dismissal on the grounds that plaintiff had engaged in outside employment without written permission, performed his duties unsatisfactorily, and failed to cooperate with fellow employees; the Treasury Department denied a further appeal.
At the time of his dismissal, plaintiff had accumulated approximately six hundred hours of sick leave. Because of back injuries incurred in the automobile accident some eight months before, plaintiff applied for and received total disability compensation under the provisions of the Federal Employees’ Compensation Act from the date of his removal until May 18, 1964; these payments amounted to approximately 75 percent of his salary rate. Since May 1964, plaintiff has received partial disability compensation.
Alleging that his removal was arbitrary and capricious, plaintiff seeks to recover salary compensation under the *14 Lloyd-LaFollette Act, 62 Stat. 354, 355, 5 U.S.C. § 652(b) (l),[1] less the amount of federal employees’ disability compensation payments he has received. The Trial Commissioner has concluded, after a trial, that plaintiff’s dismissal by the Internal Revenue Service was arbitrary and capricious. Finding 54. He has found that, even if plaintiff did engage in outside employment, his failure to obtain written permission was based on the good-faith belief of plaintiff and his superiors that he was not required to do so; and that removal of the plaintiff was a much too severe sanction according to the Internal Revenue Service’s own rules. Finding 53(1). The Commissioner has further determined that neither the charge of unsatisfactory performance of duties nor that of lack of cooperation with fellow employees was supported 'by substantial evidence. Finding 53(a) (2), (4). The defendant has elected not to challenge these findings (Defendant’s Exceptions and Brief, pp. 1, 9), and the court accepts them as correct. Accordingly, we hold that plaintiff was improperly removed in 1954. The defendant contends, however, that, since plaintiff has been either totally or partially disabled from the date of his separation, he is not entitled to recover anything on account of this wrongful dismissal.
This affirmative defense asserted by the Government is two-pronged. The first points to Section 7 of the Federal Employees’ Compensation Act, 39 Stat. 742, 743, 5 U.S.C. § 757(a), which declares that recipients of disability payments under the Act “shall not receive from the United States any salary, pay, or remuneration whatsoever [for the same period] except in return for services actually performed, and except pensions for service in the Army or Navy *15 of the United. States.” The defendant urges that this statute automatically precludes an employee who has received disability benefits from recovering back pay (for a wrongful discharge) for the same period — whether or not the award of those benefits was erroneous or improper. Although the provision may seem on the surface to cover our facts, we hold it inapplicable, by itself, to bar recovery in this suit. The clause was originally enacted as Section 7 of the Employees’ Compensation Act of 1916, 39 Stat. 742,743, the aim of which was to place federal employees under a form of workmen’s compensation. See Dahn v. Davis, 258 U.S. 421, 431 (1922). Section 7 appears to have been intended, primarily, to preclude personal injury actions against the United States {e.g., for negligence under statutes permitting suit against the Federal Government) once the employee elected to recover under the Compensation Act. See Dahn v. Davis, supra, 258 U.S. at 428-29.[2] It is the type of provision often included in workmen’s, compensation legislation to prevent double recovery from the employer for the same injury. The plaintiff, however, is seeking recovery for a wholly different wrong, that of improper discharge, and not for personal injury. Indeed, his theory is that, if he had not been removed, he would have been paid (and presumably would have performed services for the United States). His claim is therefore far outside the main purpose of Section 7, but within the spirit of the exception Congress made for services rendered. The section, in addition, has never been construed as controlling the relief provided by the Lloyd-LaFollette Act. We conclude that, in and of itself, it does not decisively close the gate on plaintiff’s claim.
For the premise of the second facet of its argument that the plaintiff’s incapacity bars recovery, the Government relies on a line of this court’s cases declaring that back pay for improper dismissal should be denied where the employee was not ready, willing, and able to resume his position during the period for which relief was sought. Corrigan v. United *16 States, 153 Ct. Cl. 392, 398 (1961); Armand v. United States, 136 Ct. Cl. 339, 342-44 (1956); Getzoff v. United States, 124 Ct. Cl. 232, 235-36, 109 F. Supp. 712, 713 (1953); Simon v. United States, 113 Ct. Cl. 182, 199 (1949); Nicholas v. United States, 53 Ct. Cl. 463, 466 (1918). The purpose of that prerequisite, first enunciated in United States v. Wickersham, 201 U.S. 390, 399-400 (1906), is to insure that federal employees who are improperly dismissed will recover no more than the amount actually lost as a result of the separation. Thus, an employee removed arbitrarily or capriciously “is entitled to recover whatever loss he may have suffered thereby.” Gadsden v. United States, 111 Ct. Cl. 487, 489, 78 F. Supp. 126, 127 (1948). “[5 U.S.C. § 652, the statute providing relief for wrongful dismissal,] was designed to compensate employees for pay which they would have earned but for the wrongful separation. If the employee was incapable of performing the work for which the pay was to be received, it follows that he has lost nothing which he would ' have earned but for the wrongful separation.” Armand v. United States, supra, 136 Ct. Cl. at 343.[3]
Plaintiff’s demand is for the difference between (1) the amount he would have received had he been paid during the entire period at his salary rate at the time of discharge and (2) the amount he actually received under the Employees’ Compensation Act. He insists this measures his pecuniary loss. But in attempting to place him as nearly as possible in the monetary position he would have been but for his wrongful discharge, we are required, by the rule that the employee must be “ready, willing, and able,” to evaluate his receipt of compensation payments for total or partial disability ever since the date of removal. At this stage of the proceedings, both plaintiff and defendant are unhappily confronted by the stumbling block that, in the past, they or their representatives have taken positions contrary to those they assert before this court. Although the plaintiff now contends *17 that he is “quite ready to return to work, and has been so ready for a substantial period of time” (Plaintiff’s Reply Brief, p. 5, filed Feb. 10, 1964), as late as May 4, 1964, he certified to the Bureau of Employees’ Compensation that he was still totally disabled for his usual work. Finding 50(c). On the other hand, the defendant now urges that, because of total or partial disability, “plaintiff has never been able to perform the duties of his former position” (Defendant’s Supplemental Brief, p. 6, filed Oct. 23,1964); but, as early as 1961, the Bureau of Employees’ Compensation tentatively set plaintiff’s disability as only 10 percent (finding 42), and in November 1962 the Bureau wrote plaintiff that he was no longer deemed to be disabled (finding 50 (a)).
To us, however, the decisive fact is that, regardless of the parties’ fluctuating interim positions, for the whole period from the date of his removal in August 1954 until May 1964, plaintiff has applied for — and defendant has in the end granted — total disability compensation. Finding 50 (d), (e) .[4] Such grants are premised on the absolute inability of the employee to resume Iris normal work.[5] Since the competent agency (the Bureau of Employees’ Compensation) has officially determined that plaintiff was 100 percent disabled for this whole time and has taken final action on that basis, we accept its conclusion of total incapacity. Although we cannot review that finding in order to decide that an employee should or should not have been granted disability compensation (see 5 U.S.C. § 793; Nolen v. United States, 124 Ct. Cl. 230, 109 F. Supp. 391 (1953); Soderman v. United States Civil Serv. Common, 313 F. 2d 694 (C.A. 9, 1962), cert. denied, 372 U.S. 968 (1963)), we are not necessarily precluded, in a *18 suit for back pay under the Lloyd-LaFollette Act, from deciding in a proper instance that the agency’s finding of disability was plainly wrong and should not be followed. But here neither party has undertaken to demonstrate that the Bureau was wrong, let alone clearly wrong, and we have no reason to disagree with its conclusions 'or to reject plaintiff’s repeated certifications that he was wholly disabled.
It follows that plaintiff’s receipt of total disability compensation from his removal in August 1954 until May 1964 precludes a finding that he would have been able to resume work during any part of that time.[6] As to that period, we must deny plaintiff’s claim for the difference between the amount he would have received had he been paid at Ms old salary rate and the sum he obtained as compensation for total disability.
Since May 1964, plaintiff has received compensation for partial disability. Though his present incapacity would apparently prevent him- from resuming work as a deputy tax collector, he has been found to be physically able and otherwise qualified to perform the sedentary tasks of an accounting clerk; the pay rate for the latter position is approximately 37 percent less than that of a deputy tax collector, and plaintiff’s compensation is therefore based on a 37 percent loss of wage-earning capacity. Finding 50 (b), (d). Does this decrease make a difference in his right to recover in tMs action ? Again we look to the purpose of the back pay provisions of 5 U.S.C. § 652, i.e. to place wrongfully discharged government employees in roughly the same monetary position as they would otherwise have been. In that light the issue becomes whether there would have been any duty or established practice on the part of the Government to reassign plaintiff, an injured employee, to a less exacting position which he was physically capable of performing. No statute or regulation imposes such a duty, and it does not appear *19 to be the practice of the Bureau of Employees’ Compensation to obtain less demanding government work for partially disabled employees or former employees. It goes almost without saying that this court cannot impose such a requirement; the amount and kinds of relief available to disabled federal employees are exclusively the province of Congress and the Bureau (free of judicial review). See, e.g., Soderman v. United States Civil Serv. Comm'n, supra. That being so, we cannot say that, if plaintiff had remained in his job but had suffered the same total disability ■which later improved, he would then have been assigned to a less exacting position giving him a salary greater than the sum he is now getting as partial disability benefits.[7] He would, rather, have been left, so far as the Federal Government was concerned, with his lessened disability compensation. For that reason, we hold that for the period since May 1964, too, plaintiff is not entitled to relief based on the difference between the amount of lfis potential salary compensation and his disability payments.
This application of the established rule that the discharged employee must be able to perform in Ms old job, plaintiff argues, is tantamount to permitting the Government to discharge its injured or incapacitated workers with impunity. Even if declaratory and injunctive remedies are put aside, this would only be the result where the employee suffers no pecuMary loss. In that case it is hard to see why the employee should recover compensation, although he may have a right to some npn-monetary form of relief.[8] Plaintiff, for instance, is in the same monetary position he would have held if he had not been dismissed arbitrarily, and the defendant has secured no monetary advantage by its action. Bemedia! *20 compensation of the type awarded by this court is not an appropriate sanction.[9]
As an independent ground for recovery, plaintiff also asserts that the defendant committed a procedural error in failing to apprise him of his disability retirement rights prior to his discharge. That requirement is stated in Memorandum No. 10 of the Jackson, Mississippi, Director of Internal Revenue. Even if such a local directive were to be given the effect of a departmental regulation granting individual rights, we cannot see how this plaintiff was so injured by noncompliance as to give him a monetary claim. The retirement benefits which he could have received at the time of his discharge were far below the amount he obtained as compensation for total disability (finding 22(b)), and the two methods are mutually exclusive. 41 Stat. 614, 611, 5 U.S.C. § 2257(f). It was apparently for this reason that plaintiff changed his initial application for disability retirement to one for employee’s compensation payments. Finding 22(a). Although we can assume, without deciding, that some procedural error was committed, there was no harm to the plaintiff.
One narrow avenue of pecuniary relief is open. Because of his wrongful discharge, plaintiff was unable to use about 600 hours of accumulated sick leave. Had he not been arbitrarily dismissed,, he probably would have chosen to go on sick leave, for some 75 working days after August 26, 1954, at full pay rather than to receive total disability benefits which were approximately 75 percent of that amomit. See 65 Stat. 679, 681, 5 U.S.C. § 2063(a), and 39 Stat. 742, 743, 5 U.S.C. § 758. The defendant asserts that plaintiff in fact elected disability compensation instead of sick leave pay. But a discharged employee is not entitled to a lump sum payment based on his accrued sick leave. Martilla v. United States, 118 Ct. Cl. 177, 182 (1950). Plaintiff applied for disability compensation instead of sick leave pay because he had no *21 option. He was forced, wrongfully as we now know, to discard his right to the latter. He can therefore recover the additional amount he would have been paid had he been able to take advantage of his accumulated sick leave.
Plaintiff is entitled to recover on account of his lost sick leave, in accordance with this opinion, and judgment is entered to that effect. The amount of recovery will he determined under Buie 47(c). Otherwise the petition is dismissed.
FINDINGS OE FACT
The court, having considered the evidence, the report of Trial Commissioner Bichard Arens, and the briefs and arguments of counsel, makes findings of fact as follows:
1. (a) Plaintiff, a non-veteran, is a citizen of the United States and a resident of Vicksburg, Mississippi.
(b) From 1939 until 1942 plaintiff was an employee of the Bureau of Prisons of the United States Department of Justice. Pie was employed as an investigator in the Alcohol Tax Unit of the Treasury Department from 1942 until November 26, 1950, when he was transferred to the Internal Bevenue Service of that Department where he served in Vicksburg, Mississippi, as a deputy tax collector of the Jackson, Mississippi, Field Division until August 26, 1954, when he was removed.
(c) Plaintiff commenced his service as a deputy tax collector at grade GS-6 with an annual salary of $4,200. Effective May 10, 1953, he was promoted to grade GS-7 with an annual salary of $4,705. At all times during plaintiff’s Government service his efficiency ratings were in either the top grade or next to the top grade.
(d) In this action plaintiff seeks to recover the salary he would have earned as a classified civil service employee from the date of his removal to date of judgment, less certain amounts.
2. (a) In 1947 there was organized in Mississippi a corporation known as the College Education Insurance Fund which was created for the specific purpose of providing a means of accumulating funds for college education through insurance and investment. Plaintiff invested $600 in the *22 Fund and was one of about 84 shareholders. He was never an officer or a director of the Fund, nor did he spend any time working on the affairs of the Fund, although he did attend a few meetings of the board of directors as a guest. The Fund became defunct in 1950.
(b) In 1949 plaintiff borrowed from the First National Bank in Vicksburg $4,000 which he deposited to his bank account, against which he wrote a check to his brother for the same amount. Plaintiff’s brother used the $4,000 in part payment for the Magee Auto Supply Company which was purchased as a business for plaintiff’s nephew to go into when he graduated from Mississippi State College. In setting up the business under the new ownership, plaintiff acquired a partnership interest. The Magee Auto Supply Company is located at Magee, Mississippi, which is about 90 miles from Vicksburg. Plaintiff was never employed by the Magee Auto Supply Company nor did he take any time away from his duties with the Internal Eevenue Service to do any work in connection with the company. Plaintiff’s only work in connection with the company consisted in periodically assisting with inventories and bookkeeping. In 1952 plaintiff sold a fourth interest in the company to his brother, and in 1953 plaintiff sold the remainder of his interest in the company to his brother.
(c) As appears in more detail hereinafter, at all pertinent times plaintiff owned rental properties in Vicksburg. Plaintiff’s visits to the properties were infrequent and he did not take any time from his duties with the Internal Eevenue Service to do any work in connection with them.
3. In 1950 when plaintiff was seeking transfer from the Alcohol Tax Unit of the Treasury Department to the Internal Eevenue Service, he wrote a letter dated May 26, 1950, to Mr. Eugene Fly, Collector of Internal Eevenue, Jackson, Mississippi, which reads in part as follows:
Eeference to our conversation May 241 wish to submit my application for transfer from Investigator, Alcohol Tax Unit to Deputy Collector.
* * * tu *
* * * At the present time I own an apartment house and duplex in Vicksburg and have kept records on their *23 operation. I am third owner in the Magee Auto Supply & Equipment Co. at Magee, Mississippi and periodically assist with inventories and bookkeeping.
I am very anxious to obtain this transfer in order that I might have a permanent post of duty in the state, of Mississippi. I am very grateful to you for consideration of my application.
Mr. John Grice, who was the senior deputy collector in the Vicksburg office of the J ackson Field Division of the Internal Revenue Service, assisted plaintiff in the preparation of the foregoing letter.
4. On one occasion prior to his transfer to the Internal Revenue Service (November 26, 1950) and on one occasion shortly after his transfer, plaintiff discussed his investments with Mr. Eugene Fly who, as heretofore indicated, was then Collector of Internal Revenue at J ackson, Mississippi. Mr. Fly told plaintiff that plaintiff’s investments were not considered to be employment or engagement in business.
5. Under date of November 5, 1951, plaintiff filled out and filed with the Internal Revenue Service an Internal Revenue form entitled Financial Statement of Employee. In listing his assets, plaintiff included $4,000 “Auto Supply” and $600 “Ins. Stock” and his real estate holdings. In response to items in the form, plaintiff listed his income from outside business as “$117” and his securities as “U.S. Govt. Bonds, $400” and “College Educational Ins. Co., $600.” In response to an item captioned “List all other assets, such as investments in partnerships, joint ventures, etc. (which includes any investments in outside business activities)”, plaintiff listed “Magee Auto Supply, $4,000.” Item 18 of the form read “Do you now have, or have you had in the past two years, any employment or business activities in addition to your Government employment? If so, give full details.” In response to item 18, plaintiff struck over the word “employment” and wrote the following: “Ves. Receive rents only and $ small income from Auto Supply business.”
6. (a) Soon after plaintiff filed the financial statement (finding 5, supra), Mr. Wilburn Buckley, one of plaintiff’s superiors in the Jackson, Mississippi, Internal Revenue office, noted the statement that plaintiff owned certain real *24 estate in Vicksburg, certain stock, and an interest in an automobile parts company at Magee, Mississippi. Whereupon, Mr. Buckley made an investigation of plaintiff’s personal business affairs and submitted a favorable report to the Internal Revenue Service on plaintiff. Mr. Buckley noted that plaintiff did not draw a salary from his outside interests, that no part of the time required of plaintiff by the Internal Revenue Service was given by plaintiff to his outside interests, and that, accordingly, plaintiff’s outside interests did not constitute a violation of Internal Revenue Service policies, procedures, or rules of conduct for employees.
(b) The evidence does not disclose specifically what were the policies, procedures, or rules of conduct for employees of the Internal Revenue Service prior to March 1952.
7. (a) In March 1952 there was published by the Internal Revenue Service and distributed to employees of the Service a 36-page booklet entitled “Rules of Conduct and Other Instructions for Employees of the Internal Revenue Service.” The Foreword of the booklet reads in part as follows:
This handbook of Rules of Conduct and Other Instructions for Employees, completely revised and brought up to date, is compiled from the various laws, Executive orders, Treasury decisions, departmental orders and regulations, and Bureau regulations governing the conditions under which we, as employees of the Internal Revenue Service, must operate.
% % H¡ # #
All decisions in personnel matters involving disciplinary action will be based on the assumption that the rules contained in this booklet have been read and understood by the employees concerned.
The receipt which each employee will be required to sign upon receipt of this booklet will be made a part of his official personnel file and will be considered as proof that he has read the entire contents.
Among the 69 rules in the booklet are the following:
23. Outside employment restricted. — No internal revenue employee may engage in any outside employment or business without having first obtained written permission through his supervisory officer from his field officer in. charge or, in the case of departmental service employees, the employee’s deputy commissioner or head *25 of division. Written permission is required even though the employment does not involve any salary or other form of compensation. Likewise, written permission must be obtained concerning interest in any business in which an employee is to take any active part or is to serve as an officer, even though no compensation attaches to such interest or office.
No employee may engage in outside employment which has a direct or material bearing on a taxpayer’s tax liability. Also, permission will generally be denied for an employee to engage in bookkeeping, accounting, valuation, or legal work; applications for exceptions will contain a complete statement of facts and will be referred, with the recommendation of the supervisory officer through channels to the Bureau for decision. Employees may not engage in any type of outside employment in which their personal interests may conflict with their official responsibilities. Applications of employees for permission to accept employment in connection with the sale of liquor will be denied. Permission will not be granted to accept or solicit orders for insurance; nor to sell or promote any type of service or investment or real estate; nor to sell stocks or bonds; nor will permission be granted for an employee to engage in any type of business activity where an employee’s official position might influence or affect a taxpayer’s action; or where the nature of employment or the hours of duty appear likely to impair the employee’s availability, capacity, or efficiency for the performance of his official duties. _ Applications of employees to teach or lecture on subjects involving accounting or Federal tax law or regulations will be referred, with the recommendation of the supervisory officer, through channels to the Bureau for decision. No revenue employee may appear for, with, or in behalf of any taxpayer as his attorney, agent, factor, or representative before any governmental agency — Federal, State, or local. The foregoing restrictions are not intended to discourage normal participation in local civic activities which are not in conflict with the Hatch Act.
‡ ‡ $
29. Financial transactions. — Employees must avoid all business or financial transactions with taxpayers having cases pending before the Bureau or field offices with which such employees have an official connection. Every situation should be avoided which involves any *26 financial consideration between an employee and such, taxpayers or their representatives.
*****
33. Speculation prohibited. — Employees are prohibited from speculating in stocks, bonds, or commodities. The purchase of securities or commodities as a bona fide investment is generally permissible, but employees shall not use confidential official information as a basis for making investments.
The booklet does not define the term “engage” or the term “outside employment or business.” Certain procedures for adverse action arising out of violations of rules contained in the booklet are hereinafter set forth (finding 52(a)).
(b) Under date of May 6, 1952, a form letter was sent to plaintiff from the Director, Internal Revenue Inspection Service, Washington, D.C., the body of which reads as follows:
A review of the financial statement, Form 1361, which you submitted to this office in response to Commissioner’s Mimeograph (Coll. No. 6701), dated October 19, 1951, discloses that you derived earnings from employment or business activities in addition to your Government employment subsequent to January 1, 1949.
It is requested that you furnish this office. with a statement setting forth the following information:
1. Whether permission to engage m outside employment or business activity was secured from your Field Officer in Charge. If permission was granted, attach appropriate evidence thereof.
2. Full details as to the nature of your service in the employment or business activity.
3. Full details as to the amount of time devoted by you in connection therewith.
It will be appreciated if you will prepare and submit the information in the order stated above at the earliest practicable date, but not later than thirty days from the date of this letter.
A copy of this letter should be attached to your reply.
(c) Upon receipt of the foregoing form letter, plaintiff discussed its contents with Mr. John Grice who was then plaintiff’s immediate superior in the Vicksburg office. Mr. Grice knew of plaintiff’s interests in the Magee Auto Supply Company, in real estate, and in the College Education Insur- *27 anee Fund, because Mr. Grice made out plaintiff’s income tax returns, but be did not regard these interests as constituting outside employment or business activity. Mr. Grice prepared and plaintiff signed a responding letter, dated May 12, 1952, the body of which reads as follows:
Apparently I did not make it clear that all of my income other than my salary is derived from rental income and a partnership in Magee Auto Supply.
My services in so far as the partnership is concerned is purely in an advisory capacity and does not in any way interfere with my official duties.
Agents collect most of the rentals and attend to the renting of apartments furnishing me with a monthly statement. Other rents are either mailed to me or collections made on weekends.
I had rental income when I accepted employment with the government. Proper notice was given my superior before purchasing an interest in the Magee Auto Supply.
Trusting this is the information you desire, I am
(d) Under date of June 6,1952, the Commissioner of Internal Revenue issued a memorandum entitled “Outside Employment Or Business” which was directed to “officers and employees of the Internal Revenue Service concerned.” The memorandum reads in part as follows:
1. The handbook of Rules of Conduct and Other Instructions for Employees of the Internal Revenue Service, dated March 1952, contains rules of conduct and the conditions under which officials and employees of the Internal Revenue Service must operate.
2. Section 23 of the handbook sets forth rules relating to outside employment or business, and requires that written permission first must be obtained before an employee may engage in any outside employment or business. This represents a change from previously existing rules in that heretofore it was not required that the grant of permission be in written form.
3. To provide an effective basis for administering the rules governing outside employment or business the procedure outlined in the succeeding paragraphs must be followed. Effective immediately, all existing permissions to engage in outside employment or business are hereby revoked.
*28 Attached to the memorandum was a form entitled “Employee’s Application for Permission to Engage in Outside Employment or Business”, the body of which reads as follows:
Bequest is hereby made for permission to engage in the outside employment or business described hereunder: 1. Name:,___ 2. Post of duty: — --- 3. Title of Present Position:- 4. Present Grade— 5. Office to which attached:---,-.-6. Nature and detailed description of outside employment or business for which permission is requested: 7. Maximum number of hours per week to be devoted to outside employment or business:_Working hours_
I hereby certify that my services in connection with the outside employment or business referred to above will not have a direct or material bearing on a taxpayer’s tax liability nor conflict with or infringe on my duties with or responsibilities to the Bureau of Internal Bev-enue, and that the statements made herein are complete and correct.
(Signature of Employee) (Date)
RECOMMENDATION OF SUPERVISORY OPEIOER
(Date) (Signature and Title)
APPROVAL OR DENIAL ACTION
I have carefully considered the request for permission to engage in outside employment or business set forth above, and it is my judgment that such activity: will
(1) interfere with the performance of the em-will not ployee’s official duties, is
(2) within the prescribed rules of conduct, is not
The request is therefore approved/denied.
(Date)i (Signature and Title)
8.On June 20, 1952, plaintiff signed an Internal Bevenue Service form M-190 which reads in part as follows:
*29 This is to certify that:
1. I have received a copy of the “Eules of Conduct and Other Instructions for Employees of the Internal Eevenue Service,” dated March 1952, and will familiarize myself with the contents and requirements thereof;
2. (Cross out paragraph not applicable.)
I am not engaged in any outside employment or business;
Plaintiff crossed out the following language on the form: “I desire permission to engage in outside employment or business, the nature of which is fully explained on the request for such permission, attached hereto.”
9. Under date of May 8,1953, Mr. J. L. Enochs, who had succeeded Mr. Eugene Fly as Director of the Jackson, Mississippi, Field Division of the Internal Eevenue Service, sent a letter to plaintiff which reads as follows:
May 8,1953
Mr. Joe B. Everett
Internal Eevenue Agent
P.O.Box 1047
Vicksburg, Mississippi
Dear Mr. Everett:
I am transmitting herewith Form 50, containing notification of your promotion from GS-6 to GS-7, to fill the position of Internal Eevenue Agent-Collection Officer. I want to take this opportuntity to congratulate you on your promotion and to assure you that such promotion was made on the basis of a job well done.
With kindest personal regards, I am Sincerely yours,
s/ J. L. Enochs
J. L. ENOCHS
Enclosure Director
10. (a) On December 16, 1953, plaintiff was injured through no fault of his own in an automobile accident while in performance of his duty at Eolling Fork, Mississippi. He suffered cracked ribs, cracked vertebrae, contusion of the knees and general body injuries. As a result of his injuries, plaintiff was required to take sick leave for hospitalization and other treatment.
(b) On December 22, 1953, Mr. J. L. Enochs, the Field Division Director, reported the facts of plaintiff’s accident *30 to the Bureau of Employees’ Compensation of the United States Department of Labor, and thereafter from time to time the Field Division corresponded with plaintiff and with the Bureau of Employees’ Compensation respecting plaintiff’s injuries, treatment, and condition.
11. (a) In January 1954 Mr. H. Lee Lindsey, who was head of the Delinquent Accounts Section of the Jackson, Mississippi, Field Division of the Internal [Revenue Service, referred to plaintiff for investigation the case of the Farmers Lumber Company of Bolling Fork, Mississippi. Plaintiff proceeded to Bolling Fork where he ascertained that the Farmers Lumber Company, which had gone out of business, had been owned by a Mr. Carl Day. Plaintiff called at the residence of Mr. Day and was advised by Mrs. Day that Mr. Day was then in the state hospital for the insane which is located about 14 miles east of Jackson, Mississippi, at Whitfield, Mississippi. At the time of plaintiff’s investigation, Mr. Day was actually in the hospital at Whitfield where he had been admitted as an alcoholic. Plaintiff had been informed by Mr. John Grice, the senior deputy collector in the Vicksburg office, that Mr. Day was a confirmed alcoholic.
(b) On January 11, 1954, plaintiff sent a letter which he personally typed reading as follows :
Vicksburg, Miss.
Jan. 11, 1953 [sic]
In Be: Farmers Lumber Co.
#4/20416
and your letter of Dec. 21,1953
Mr. H. Lee Lindsey
Jackson, Mississippi
Dear Mr. Lindsey:
Please find attached hereto the above inv.
According to Mr. [sic] Day this taxpyer[sic] is now in Whitfield near Jackson, Miss.
1. However, the farmers [sic] Lumber Co. has discontinued business.
2. Think the assets are still in litigation.
3. Have never met Mr. Day. Understand he takes a nip now and then or use to.
Very truly yours,
Joe B. Everett CO.
*31 In typing the letter plaintiff made typographical errors as to the date of the letter (1953 instead of 1954), by omission of the letter “s” after the word “Mr.” as it appears in the second sentence, by omission of the letter “a” from the word “taxpyer” as it appears in the second sentence, and by using the lower case “f” in “farmers Lumber Co.”
(c) Plaintiff, as heretofore noted, served in the Vicksburg office of the Jackson, Mississippi, Field Division of the Internal Eevenue Service. Whitfield, Mississippi, where the state hospital was located, was not in the Vicksburg territory but was in the Jackson territory; hence, any interview of Mr. Day at Whitfield would have had to be conducted by an Internal Eevenue agent working out of the Jackson office.
12. (a) The body of a memorandum dated January 28, 1954, addressed to plaintiff from H. Lee Lindsey who, as heretofore noted, was head of the Delinquent Accounts Section of the Jackson, Mississippi, Field Division of the Internal Eevenue Service, reads as follows:
subject : Alfred J. Sloan
2903 Clay St.
Vicksburg, Miss.
Under date of January 27, 1954 Internal Eevenue Agent Vincent E. Shannon, Jr. transmitted to this office a warrant for distraint No. 4220 against the above taxpayer, also a check in amount of $18.00 as a payment thereon.
With the aJbove documents, Mr. Shannon wrote a letter advising that he was sending this investigation in because you refused to accept the payment which the taxpayer sent to the office by mail, and he requested you on two different occasions to accept the warrant and the part payment, and that you made the remark that you were not going to do it.
Under date of January 20, 1954, Group Supervisor Eaymond K. Conner, directed a letter to Mr. Vincent E. Shannon, Jr. at Vicksburg, Mississippi, instructing him to turn over all of the warrants for distraint and other investigations that were in his possession to you. Mr. Shannon has sent a list to the office showing that these investigations were transferred to you according to instructions.
It is requested that you explain the reasons for your action in this case.
*32 (b) The evidence does not contain the reply by plaintiff to the memorandum.
(c) At the trial plaintiff testified that at the time of the occasions referred to in the memorandum, he did not think that the warrants were his responsibility.
(d) At all pertinent times plaintiff’s only fellow employees in the Vicksburg office were Mr. John P. Grice and Mr. Earl Shannon, both of whom testified at the trial that plaintiff’s cooperation with them was excellent at all times and that plaintiff’s relationship with them was most cordial. Both Mr. Grice and Mr. Shannon testified on plaintiff’s behalf in connection with the administrative hearing involving plaintiff’s removal. Mr. Wilburn Buckley, who, as heretofore noted (finding 6), was one of plaintiff’s superiors in the Jackson, Mississippi, Internal Bevenue office and who made an investigation of plaintiff’s personal business affairs, also testified at the trial that he had personal knowledge of the work performed by plaintiff during the period from November 1950, when plaintiff was sworn in as an officer of the Internal Bevenue Service, until July 1953, and that during this period plaintiff’s work was “excellent.”
13. (a) The body of a letter dated February 10, 1954, to Mr. H. Lee Lindsey from plaintiff, reads as follows:
Please be advised that as of this date we have been informed that Mr. Oscar Stamps, a taxpayer who has been habitually delinquent in filing his social security returns, has passed from life on Nov. 30, 1953. Therefore, if you see fit a letter directed to him and explaining the necessity of filing a final return for the fourth Quarter — Oct. and Nov. 1953 — we feel that who ever is handling his affairs will take care of the return.
The third Q return was mailed your office on Eeb. 2, 1954 as per my form 795, receiving a direct recall from your office on same.
(b) The body of an office memorandum dated February 12, 1954, to plaintiff, signed H. Lee Lindsey, Chief, DA&B Branch, reads as follows:
subject: Oscar Stamps
Bussum, Mississippi
Beceipt is acknowledged of your letter of February 10, 1954 concerning the above taxpayer.
*33 You stated that the taxpayer had been a habitual delinquent in filing Employment tax returns, “has passed from life on November 30, 1953. Therefore if you see fit a letter directed to him and explaining the necessity of filing a final return for the fourth quarter — October and November 1953, we feel that whoever is handling his affairs will take care of the return.”
If I understand your letter correctly, the taxpayer evidently died on November 30, 1953. If such is the case, furnish the name of his legal representative in order that correspondence may be conducted with that person.
If administration has been started with respect to the taxpayer’s estate, contact the executor or administrator and request that the delinquent return be filed. In the event estate proceedings will not be instituted, then you should contact a member of the taxpayer’s family that will wind up his affairs and secure such returns as may be due.
(c) At the trial plaintiff testified that the suggestion which he made in the above letter of February 10,1954, that a letter be directed to the then deceased Mr. Stamps, was a practical way of establishing communication with Mr. Stamps’ administrator or executor, or with some person who was handling the deceased Mr. Stamps’ affairs. Prior to February 10, 1954, plaintiff had sent a letter addressed to Mr. Stamps in connection with his social security account which was delinquent. Someone had received the letter at Eussum, Mississippi, some 75 miles from Vicksburg, and had put a notation in pencil at the bottom of the letter “Oscar Stamps passed from life to death on the 30th of November, 1953.” The letter was then returned to plaintiff. Plaintiff’s suggestion in his letter of February 10, 1954, was in accordance with normal office procedure of the Internal Eevenue Service in such cases.
14 On February 16, 1954, pursuant to directions which plaintiff had received from his superiors in the Internal Eeve-nue Service, he reported to the Jackson, Mississippi, Field Division office where he was questioned by an Internal Eeve-nue Service inspector concerning his connection with the Magee Auto Supply Company, the College Education Insurance Fund, and his real estate. Plaintiff protested to the inspector that he should be furnished with a copy of the *34 charges before being questioned; whereupon, the inspector suggested that plaintiff talk to Mr. J. L. Enochs, the Field Division Director, who then told plaintiff to go ahead and answer the questions. Plaintiff returned to the room where he had been talking to the inspector, and the inspector continued with the interrogation. Several days later the inspector appeared at the Vicksburg Internal Eevenue Service office with a report of the questioning of plaintiff and, at the inspector’s request, plaintiff signed a copy of the report and was given a copy of it.
15. The body of a letter dated March 22, 1954, addressed to the District Director, United States Treasury Department, Internal Eevenue Service, Jackson, Mississippi, from the Bureau of Employees’ Compensation, United States Department of Labor, reads as follows:
Eeceipt is acknowledged of your letter dated March 9, 1954, in regard to the case of Mr. Joe B. Everett, who claims he was injured on December 16, 1953 while employed as a collection officer by your establishment, and who also sustained injury on January 6, 1944, while employed as an investigator by your establishment.
The enclosures submitted with your above mentioned letter have been noted, however, treatment as recommended by Dr. Purks is not being authorized. Instead the Bureau is referring Mr. Everett to the U.S. Public Health Service Hospital, New Orleans, Louisiana, for a complete survey, and there is enclosed herewith, a copy of the appropriate authority, from the Bureau’s Medical Branch. The original of this authority has been mailed to Mr. Everett direct.
In regard to this case, although there is no assurance that his claim will be allowed, if Mr. Everett loses pay for more than three days by reason of the alleged injury, he should submit official Forms CA-4 and CA-4A. In addition, please submit Form CA — 2, Official Superior’s Eeport of Injury, in order to cover the recurrence of disability which will result because of the claimant’s referral to the hospital.
Also, you are advised that the Bureau has recently completed a careful study of Mr. Everett’s January 6, 1944, injury, case, (Act. 1112233, X-45358) and has approved the injury as coming within the purview of the Federal Employees’ Compensation Act, as amended. Accordingly, Mr. Everett is entitled to all applicable *35 benefits of the Act in regards to the injury sustained by him on January 6,1944, and, if he has lost pay for more than three days by reason of this injury, he should also submit official Forms CA-4 and CA-4A. For your information, the case was accepted for “chronic lumbo-sacral strain superimposed on minimal osteo-arthritis of the lumbo-sacral joint”. For the present, no action appears indicated in regard to this particular case and it is being maintained in the Bureau’s inactive files. Mr. Everett is entitled to additional medical treatment in connection with this injury, if indicated, and should advise the Bureau immediately if he is in need of such treatment.
A copy of this letter is being sent to Mr. Everett for his information.
IS. (a) The body of a letter dated July 26,1954, addressed to plaintiff from Mr. J. L. Enochs, the District Director of the Field Division, reads as follows:
This is to notify you that it is proposed to remove you from your position of Tax Collector, GS-7, effective at the close of business 30 days from date of receipt of this letter.
This notice of proposed adverse action is issued in accordance with instructions in Part 9 of the Civil Service [Regulations, which authorize and prescribe procedures for the removal of employees from the competitive service when such action will promote the efficiency of the service. You are advised that the proposed action, which will promote the efficiency of the Internal Revenue Service and of the Jackson District, is based upon the following specific charges:
1. Engaging in outside employment without written permission.
On June 20, 1952, you signed Form M-190, whieh stated that you were not engaged in any outside employment or business. It has been verified and you have stated that you had 'been a partner in the Magee Auto Supply Company, Magee, Mississippi, since Í947, and that you sold your interest, in part, in 1952 and the balance in 1953. Further in a letter dated February 8,1954, you stated that you were a stockholder and a member of a Board of Directors in an Insurance Company. You further stated that you disposed of your stock in 1953. At the time of your signing the M-190, you received a copy of “Rules of Conduct and Other Instructions for Employees of Internal Revenue Service.” Paragraph *36 23, page 9 of this booklet, states that no Internal Revenue employee may engage in any outside employment or business without first obtaining written permission. Your file shows no record of permission to engage in outside employment or business with either the Magee Auto Supply Company or an Insurance Company.
2. Unsatisfactory performance of duties.
On December 21,1953, the Chief, Delinquent Accounts and Returns Branch wrote you requesting certain information relative to the Farmers Lumber Company. The report you submitted on this request was irrelevant and furnished no information whatsoever to this office regarding the information requested. Furthermore, in your reply you referred to a statement made by Mr. Day and then in the same report, you stated that you had never met him. You inferred that this individual partakes of intoxicating beverages now and then which has no bearing whatsoever on the investigation you were to make and reflects on the character of the individual. It is apparent that no attempt was made to clarify and secure the information requested by the Chief, DAR Branch.
On February 10, 1954, you wrote the Chief, DAR Branch relative to one Oscar Stamps, stating that Mr. Stamps had passed from life on November 30, 1953, and suggested that a letter be directed to him explaining the necessity of filing the final return for social security in the fourth quarter. Such information was wholly uncalled for and should never have been made a part of official correspondence with this office.
3. Driving an automobile on official business with an expired driver’s license.
At the time you were involved in an automobile accident at Rolling Fork, Mississippi, on December 16, 1953, you were fined for driving an automobile with an expired driver’s license. Although you were not at fault in this accident, the fact still remains that your driving an automobile on official business with an expired driver’s license could have brought embarrassment or discredit to the Internal Revenue Service.
4. Lack of cooperation with fellow employees.
On January 27,1954, an investigation was forwarded to this office by Mr. Vincent E. Shannon, Jr., sending in a payment which he stated that you refused to accept. It was stated that on two different occasions you were asked to send in this payment and each time you replied with a sarcastic remark and stated that you were not going to. On January 28,1954, the Chief, DAR Branch forwarded *37 you a letter requesting an explanation of your actions in this matter. On January 29, 1954, you replied to this request but the letter fails to justify or explain your actions as requested.
5. Furnishing conflicting statements with regard to management of real estate.
In a letter addressed to my personal attention dated February 28, 1954, you stated that very little of your personal time is required for your real estate investments since agents have the authority to rent, collect the rent, and maintain the property. You further stated that you did not mean to imply that you did not visit the property or consult with the agents regarding the property. Further in the same paragraph you state, “all but three of my rental units are handled by agents and two of these mail their checks to me and the other pays either me or my wife.” In the interrogation by Inspector Holloway you stated, “people that run the apartment houses rent it to whom they want to; collect the rent; turn the rents over to me or deposit them in the bank.” In answer to a further question you stated that you rent your houses through an agent and further stated that you took no personal interest in either one other than that in your spare time sometimes you may go around if they are having repairs or something done. In answer to the question that you let your agent have full swing on what to do you stated that there was no use of you bothering about it. However, in the same paragraph you make the following statement, “I got enough worries without it; had storm damage to three apartment houses, and since this wreck I got hurt, I haven’t been physically able to tend to the repairs properly, but have just had to do the best I could with the repairs.” It appears from your letter dated February 28,1954, and from your testimony in the investigation that you have furnished inconsistent statements with regard to the amount of time and personal effort devoted by you to the management of your apartment houses, a matter of considerable significance in view of the charges that you have engaged in other outside business activities without written permission.
You are advised that you have a right to answer these charges personally and in writing, within seven days from receipt of this letter, giving reasons why the proposed action should not be taken, and to furnish affidavits or other evidence in support of your answer. Any answer you submit will be given due consideration before a final decision is made regarding the proposed action. Regardless of whether or not you reply to these *38 charges, you will be given, written notice of the final decision before any action is taken.
During your notice period you will remain in your present position in an active duty status.
(b) As appears in findings 24 and 34(c), infra, it was subsequently administratively found that charge 3, driving an automobile on official business with an expired driver’s license, was overcome by evidence submitted in plaintiff’s defense, and charge 5, furnishing conflicting statements with regard to management of real estate, was not considered sustained by the evidence.'
(c) At no time prior to the receipt by plaintiff of the foregoing letter of July 28, 1954, did any official of the Internal Revenue Service reprimand plaintiff or advise him that his conduct might be in violation of the rules of conduct for employees of the Internal Revenue Service.
17. (a) The body of a letter dated July 30,1954, addressed to Mr. J. L. Enochs, Director of Internal Revenue, Jackson, Mississippi, from plaintiff, reads as follows:
In reply to your letter of July 26, 1954, please let me state that I am, as you know, unalterably opposed to any separation from the service, and I do desire to protest, in writing and also in person. I see no need at this time to file any affidavits or any supporting evidence, because there is no conflict in the facts. I am assuming that you have nothing in your files to the contrary of what I shall now repeat. If there are any such facts, I would be pleased to receive them, because they are bound to be in error.
With reference to paragraph 1 in your letter, I have never engaged in any outside business or employment within the meaning either of the law or in the plain, ordinary interpretation of the language. Several years ago I did help finance the Magee Auto Supply business in Magee, Mississippi. I did nothing but what any ordinary, human being would do under similar circumstances. My brother wanted to get into the business. He has a son who was expected later to graduate from Mississippi State College in Business Administration. At the time, the Magee Auto Supply business was owned by other people and was about to go under. My brother did not have sufficient funds to buy it. He had been in the garage and repair business and he thought it was a good opportunity. It was and is a small concern and *39 it could not support a number of people. In fact, the best that could be done with it would be to support my brother and his son, and they would have to devote their own time and attention to it. To help him, I put up part of the purchase money, with the understanding that I was to have nothing to do with the running of the business and would not devote any of my time ana attention to it. That understanding has been kept. My brother’s son graduated and has gone into the business and I have sold my interest to him and to my brother so that I own nothing now. So far as the profits from the business during the time I owned it may be concerned, they were so small as to be inconsequential. These profits are all shown on my income tax returns and are available to this department and will bear out what I am saying. I do not believe that the United States Government condemns this type of action. I do not believe that anyone could criticize me for helping my own people.
With reference to the insurance company, several years ago in Vicksburg, a number of Vicksburgers put up very small amounts of money to form a College Education Insurance Company. My contribution to that company was $625 for 50 shares. We all knew at the time that it was starting something from scratch, but it was hoped that it could be used by most of us as a means of getting our children educated and at the same time would be helpful to our community. There was never any expectation of any profits of any consequence from the business. I did serve as a member of the Board of Directors on a couple of different occasions with about six others. We met infrequently two or three times a year. and the time that I spent in those meetings was negligible and was out of office hours. No compensation whatsoever was received for our services as directors. I have never received a dime from any dividends from this company. Again it was my understanding at all times that this activity on my part was not engaging in outside employment.
With reference to paragraph 2, I undertook to do and furnish the proper information on this item. The charge that I quoted Mr. Day and then denied having met him is based solely on a typographical error. I had never met Mr. Day. I talked to Mrs. Day. If any report indicates the statement from Mr. Day to me, it should have read “Mrs.” Day. So far as reflecting on Mr. Day is concerned, I had endeavored to obtain all available information that I could. Mr. Day normally would *40 have been, the one to have given the information, but Mr. Day was at that time confined to Whitfield, the state institution for the insane. Agent John Grice gave me the information that Mr. Day drank. Mrs. Day had advised me of his confinement to Whitfield. If Mr. Day had been insane in the normal sense, then of course it would have been foolish for anyone to have interviewed him at Whitfield. It is customary in this state, as you know, for individuals to be sent to Whitfield who have drunk to excess and are unable to stop. If this were true, Mr. Day would be able to reasonably furnish an interviewer with intelligent information, whereas _ he might not have been able to do it had he been suffering from mental illusions. I though the information therefore was appropriate to be furnished, namely, that Mr. Day drank. Also, it is my understanding that certain precautions are to be taken when interviews are had with a person who drank. For both of these reasons, the information, in my judgment, was pertinent and was not in any manner a reflection upon Mr. Day. In fact, there might be some argument that it would be preferable, from his standpoint, to have it known that he was in Whitfield because he drank rather than to be in Whitfield because of incurable insanity. More than likely, if you will check in Bolling Fork, you will find that he was definitely committed to Whitfield because of drinking, and probably such is also reflected by the official records at Whitfield.
With reference to Oscar Stamps, the letter I wrote speaks for itself. I thought it was the simplest way of obtaining the information to have the letter written to Mr. Stamps and that whoever was handling his affairs would respond to it. It was obvious that Oscar Stamps was the smallest type of operator and exceedingly doubtful that he would have a legal representative or an estate to be administered upon.
With reference to paragraph 3, on November 9,1953,1 had applied for my renewal of my driver’s license and had x-eceived a receipt for renewal application from the Sheriff’s Office in Warren County, so dated, showing a payment of the proper amount. The actual license was not received by me until January of 1954. This delay is occasioned because of the method of operation between the Sheriff’s office and the Mississippi Highway Safety Patrol. I believe that a delay of 90 days is not unusual. I was injured in the accident on December 16, 1953, and in no shape to fully understand the exact procedure then involved. I was fined for driving and an appeal was *41 taken. My attorney advises me that he anticipates no difficulty in eliminating this fine.
With reference to paragraph 4,1 did not refuse to send in a part payment. Mr. Shannon’s accounts were all transferred to me for attention. All mail and other data received by me in connection with these accounts have been promptly taken care of. I did not have, myself, a key to the post office bos. I did ask for an additional key to the box, but was advised that only two were available and that they had been furnished to Mr. Shannon and Mr. Grice. It was my understanding that all matters to receive my attention would be put on my desk for such attention. Mr. Shannon undertook, himself, to send this matter in and at no time was it placed on my desk for attention in the ordinary routine. I submit, further, that my record of cooperation in my many years of government service must be excellent if in that period this could be the only item that could be brought up in any manner against me.
With reference to paragraph 5 of your letter of July 26, the facts are clear and are not subject to contradiction. I did not make any inconsistent statements and I cannot agree with you that your paragraph 5 indicates contradictions of any consequence. I do own three apartment houses. These, to be exact, are old, frame buildings, formerly one-family homes which have been converted into small apartments. Two of them are handled by a Mrs. Fassbinder. She receives a commission of 5% of all the rentals up to $400 and 10% above $400. The third apartment house is handled by Mr. and Mrs. E. Q. Bowman, who live there. They get 10% of the net after all running, monthly expenses have been paid.
In addition to the three apartment houses, I own two small cottages which have been converted into duplex apartments. One is on Washington Street, the other on Security Street. I have a wife and a daughter. Up until the first of this month, the tenants in the duplex on Security Street were the original tenants who were there almost from the time I bought it. They have been most reliable and have each mailed their rent checks, and it has never been necessary for me to solicit from them. I did handle the renting of the duplex on Washington Street. On one side of that duplex, the tenant has been there for about 5 years. There has been some change in the tenancy on the other side. My wife works and my daughter now teaches school. There has never been any special method followed by me in the renting of this duplex. On some occasions my wife would take care of *42 the collections or my daughter and on some occasions I would, and the same thing was true in renting it. I never devoted any of my working time to it or any other activity.
With reference to the repairs to any of these apartments, I have never undertaken, personally, to make any repairs to any of them. They have been done_ on contract, or the tenants themselves have gotten the job done and sent me the bill. The tornado did severely damage two of the apartments. They were covered by insurance and the money was used to repair the damage on a contract basis.
The foregoing are the facts and they are consistent with any statement I have made at any time. My wife, my daughter and I are now working. We have endeavored to be thrifty and to lay something by in the form of investments. I feel that this is a natural, normal basis for any family and, in doing so, I have conscientiously given full time and attention to the performance of my duties with the United States Government, and nothing I have done has in any manner brought discredit on either me or the Government. I believe my record speaks for itself. In fact, the record demonstrates that I am now performing the work formerly requiring two men and that my accounts and my inventories even now are in better shape than they have been for years.
I would appreciate your affording me the opportunity of appearing personally before you or anyone else to refute the unfounded charges that have been made against me.
(b) Although in the third paragraph of the foregoing letter plaintiff stated that he did serve as a member of the board of directors (of the College Education Insurance Eund), at the trial plaintiff testified that at the time he sent the letter he had a recollection that he had served on the board, but that after subsequently checking with the manager of the Fund, a Mr. Kenneth McLaughlin, plaintiff ascertained that he had attended a few meetings of the board as a guest, but was not actually a member of the board.
18. The body of a letter dated August 3, 1954, addressed to plaintiff from J. L. Enochs, the District Director of the Field Division, reads as follows:
On July 27,1954, you received a copy of a letter from me dated July 26,1954, which notified you of the inten *43 tion to remove you from the service for unsatisfactory performance of duties.
All five of the specific charges upon which this intended removal was based were stated in the letter of July 26 and will not be repeated in this letter.
This letter is to notify you that all the answers to the five charges which you submitted in your letter dated July 30,1954, have been given careful consideration. It is my decision that your answers to all five charges are not sufficient enough to warrant a change in the proposed action. Therefore, you will be separated from your position with this agency effective close of business, August 26, 1954.
You are advised of your right to appeal this decision through the agency grievance procedure. The procedure to be followed is that your appeal should be in writing and directed to the Eegional Commissioner, Internal Eevenue Service, Eoom 827, Peachtree-Seventh Building, 50 Seventh Street N.E., Atlanta 5, Georgia. Your appeal may be in any form that you desire to submit it and it is not required that the appeal be submitted through channels. After consideration of your appeal by the Eegional Commissioner, you will be notified by them of the outcome.
You are further advised of your right to request an investigation of this removal if you feel that the procedures prescribed have not been followed. This appeal is to the Civil Service Commission, and should you appeal, it should be forwarded to the Eegional Director, Fifth U.S. Civil Service Eegion, 5 Forsyth Street N.W., Atlanta 3, Georgia. It is called to your attention, however, that no case will be investigated by the Commission unless the request for such investigation is received by the Commission within ten days of the effective date of the separation.
19= Under date of August 5, 1954, plaintiff wrote two letters:
(a) A letter to the Bureau of Employees’ Compensation of the United States Department of Labor, the body of which reads as follows:
As is indicated in your letter of March 22, 1954,1 am hereby notifying you that I am being treated at this time by Dr. E. E. Howard of this city at my personal expense, and that I am awaiting an appointment at the Campbell’s Clinic in Memphis with Dr. Speed. My in *44 jury of January 6, 1944 to my back and re-injury on December 16, 1953 while in performance of official duty has become a source of constant pain.
Being required, to lie on my back on a board for a week and then being placed in traction for the following week in the Marine Hospital in New Orleans, La. in October 1953 also contributed to a worsening of the condition.
While at the Marine Hospital in Memphis, Tenn., I was required to sit on a wooden bench and await a specialist one afternoon from 1 p.m. until. 5:30 p.m. and then was not permitted to see the specialist that day. This caused muscular spasms in my back and severe pain for several days. The food was substantial and good, but just did not agree with me and caused considerable discomfort.
In the event it is required that I return to a government hospital it is respectfully requested that the hospital be notified of the date I am to arrive and necessary arrangements made so that I might not be required to stay for an extended period.
Disability Retirement is indicated, and this is formal request for same.
(b) A letter to Mr. H. Lee Lindsey, head of the Delinquent Accounts Section of the Jackson, Mississippi, Field Division, the body of which reads as follows:
This is to formally notify you that on Doctors orders I will be on sick leave until further notice.
Reference to letter addressed to the
District Director
U.S. Treasury Department
Internal Revenue Service
Jackson 5, Miss.
and dated March 22,1954 from the U.S. Bureau of Employees’ Comp. From recent examinations it is indicated that I will not be able to return to work for some time. On December 16, 1953 while in the performance of official business my back was severely re-injured and has been causing constant pain since to the same general region of my back as was injured in the performance of duty on January 6,1944.
This is a formal request that you do or cause to be done, as my supervisor, any and all things necessary to effect my disability retirement.
Plaintiff did not receive a reply to the foregoing letter.
*45 (c) At the time of Ms discharge, plaintiff had to his credit approximately 600 hours of accumulated sick leave, which, as a result of the discharge, he did not and could not use. If he had not been discharged, he would probably have used this sick leave during the period immediately following August 26,1954.
20. On August 8, 1954, J. L. Enochs, the District Director, issued a Notification of Personnel Action in which plaintiff was advised of his “Separation (Inefficiency) ”, effective August 26, 1954, for the following reasons:
Failure to comply with existing agency instructions, unsatisfactory performance of duty with reference to securing information requested, driving an automobile on official business with an expired driver’s license, lack of cooperation with fellow employees, and furnishing conflicting statements in regard to outside activities.
21. (a) By letter dated August 11,1954, addressed to the [Regional Commissioner, Internal [Revenue Service, plaintiff appealed from the decision of the District Director that plaintiff be removed from office. Plaintiff enclosed with the letter a number of letters and affidavits, and requested “a personal hearing on the charges” preferred against him.
(b) A responding letter dated August 19, 1954, addressed to plaintiff from the Acting [Regional Commissioner, reads in part as follows:
We have carefully reviewed your letter and the material attached to it, and also the report of the recent investigation of your , conduct which was made by the Office of the [Regional Inspector. After reviewing all of the available information, we find no basis for overruling the decision of the District Director in your case.
Since you stated in your letter of August 11,1954 that you were not given an opportunity to appear personally in answer to the charges made against you, we asked the District Director for further information on this point. He has advised us that while you stated in your written reply dated July 30, 1954 that you would appreciate an opportunity to appear personally 'before him, you did not within the 7 days allowed for a reply call on him or ask for a definite appointment, although on at least one occasion during this period you were m the vicinity of the district office. He advised that you would have been *46 granted an interview during the 7 days between the issuance of the notice of proposed adverse action and the letter advising you of the decision to remove you, if you had requested an appointment or called on him but that you did not do so and therefore the latter notice was issued upon the expiration of the 7 day period allowed you for reply. The District Director has informed us further that, after receiving the notice of the decision to remove you, you did request an opportunity to talk with him, which was immediately granted, and that you and your attorney called on him and discussed the matter on August 9,1954. Therefore, it does not appear that you have been denied the opportunity which was offered you in the notice of proposed adverse action to reply personally as well as in writing.
In the last paragraph of your letter of August 11, 1954 you requested a personal hearing on the charges preferred against you. The Treasury Department Grievance Procedure does not provide for a hearing by a Grievance Committee except at the Treasury Department level, and we are not able to authorize official travel to Atlanta for the purpose of a hearing in this office. However, if you care to visit this office at your own expense and on approved annual leave, the Regional Commissioner, the Assistant Regional Commissioner-Administration, and the Chief, Personnel Branch, will be glad to talk with you about this matter. If you are not satisfied with this decision and wish your appeal to be forwarded to the Commissioner of Internal Revenue for further consideration, please let us know and it will be forwarded.
22. (a) The body of a letter dated August 21, 1954, addressed to the Bureau of Employees’ Compensation of the United States Department of Labor from plaintiff, reads as follows:
I have been advised that in my letter to you of August 5, 1954 I should have applied for employees compensation instead of disability retirement.
I inquired of the Jackson, Miss, office of the Director of Internal Revenue for some forms CA-4 and CA-4-A as suggested in your letter of March 22, 1954, and was advised that you would probably mail all necessary forms to me.
Since you have the original forms completed at the time of my accident filed with your office, would you *47 please furnish me with all the necessary information so I will be able to complete forms CA-4 and CA-4-A.
I spent two weeks in a clinic in Excelsior Springs, Mo. last spring, more than two weeks in the Marine Hospital in New Orleans, La. last October, treatment for several months at the Lutheran Hospital in Vicksburg, Miss., and at my doctor’s suggestion have been getting frequent physiotherapy and massages at the local Y.M.C.A. In April of this year I went to Campbell’s Clinic in Memphis, Tenn., then to the Marine Hospital in Memphis for about ten days, back to Campbell’s Clinic the first of this month, and have been getting physiotherapy and treatments from Dr. E. E. Howard of Vicksburg for a number of years.
My condition is such that I am not able to perform my duties and this is a formal request for Employees Compensation.
(b) By ultimately qualifying under the total disability provisions of the Federal Employees’ Compensation Act, 5 U.S.C. §§ 753(a), 756, plaintiff was entitled to receive 75 percent of his monthly salary, which amounted to approximately $3,525 for the year following his removal. Had plaintiff instead elected disability retirement under 5 U.S.C. § 698, he would have received a maximum of $1,173 for that year.
23. On September 1, 1954, J. L. Enochs, the District Director, issued a Notification of Personnel Action, in which plaintiff was advised that the nature of the action indicated in the notification of August 8, 1954, was being corrected from “Separation (inefficiency) ” to “Removal.”
24. A letter dated September 17,1954, addressed to plaintiff from the Regional Commissioner of the Internal Revenue Service, reads in part as follows:
The Judgment of the Circuit Court of Sharkey County, Mississippi, reversing your conviction on a charge of driving with an expired driver’s license on December 16, 1953, apparently settles in your favor the question of whether you were driving with an expired driver’s license when you were involved in an automobile accident at Rolling Fork, Mississippi, on that date. However we note that you apparently had been driving without a proper license from June 30,1953, when your driver’s license expired, until November 9, 1953, when *48 you applied for renewal. In any event, tlie charge of driving an automobile on official business with an expired driver’s license was only one of five reasons for your removal, and its elimination would not be cause for overruling the decision of the District Director to remove you.
25. By letter dated September 22,1954, plaintiff appealed the ruling which he had received in the letter dated August 19, 1954, from the Acting Regional Commisioner to the Commissioner of Internal Revenue, and asked that a full hearing be granted.
26. A letter dated December 3,1954, addressed to the Bureau of Employees’ Compensation from J. L. Enochs, District Director, reads in part as follows:
4. Mr. Everett was permanently removed from the rolls of this office effective August 26,1954.
5. The reason for removal from the rolls of this office was due to his failure to comply with existing agency instructions, unsatisfactory performance of duty with reference to securing information requested, driving an automobile on official business with an expired driver’s license, lack of cooperation with fellow employees, and furnishing conflicting statements in regard to his outside activities.
6. At the time of removal, Mr. Everett was employed as a Tax Collector (General) (Collection Officer), GS-7, with a salary of $4830 per annum.
7. At the time of removal he was performing his usual duties.
8. See Item 7 above.
9. This employee did not lose any pay as a result of the injury between the date he resumed work after the injury and the date he was separated from the service.
10. No benefit of a medical examination was given at the time Mr. Everett was removed from the rolls of this office.
27. On December 16, 1954, pursuant to a memorandum of November 22, 1954, from the Assistant Commissioner of the Internal Revenue Service to the Regional Commissioner, a grievance hearing was conducted by the Assistant Regional Commissioner of the Atlanta District in Jackson, Mississippi. Plaintiff, who was represented by counsel, testified and offered the testimony of several witnesses. The essence of the *49 pertinent testimony was that plaintiff’s connections with the College Education Insurance Fund, the Magee Auto Supply Company, and his real estate did not interfere with plaintiff’s official activity as an employee of the Internal Eevenue Service. In the course of his testimony plaintiff stated that he had knowledge of the memorandum dated June 6,1952, entitled “Outside Employment Or Business” (referred to in finding 7(d), supra). Plaintiff further stated that he had not discussed the matter of outside employment with any official of the Collector’s office (or subsequently, the Director’s office) after June 20,1952, until the matter was brought to his attention by the Inspection Service investigation. There were no witnesses offered on behalf of the Internal Eevenue Service.-
Several documents, principally correspondence between the parties, were introduced.
28. On December 20, 1954, plaintiff’s physician, Dr. W. K. Purks, expressed the opinion on a form which plaintiff filed with the United States Employees’ Compensation Commission that plaintiff had been totally disabled for all work from August 5, 1954, to December 16, 1954, and had been partially disabled for his usual occupation from December 16,1954, to December 20,1954.
29. (a) The body of a letter dated March 25, 1955, addressed to plaintiff from the Acting Commissioner of the Internal Eevenue Service, reads as follows:
I have your letters of September 22 and October 14, 1954, and the entire history file including the grievance hearing concerning your appeal of your removal from the Service, effective August 26,1954.
I have studied carefully all the evidence relating specifically to the charges for removal and your answers to them, and I feel that the decision reached by thé District Director J. L. Enochs was proper. Accordingly, on the basis of the findings, your appeal is denied and the removal action is affirmed.
You may appeal this decision to the Director of Personnel, Treasury Department. If you desire to appeal, you should do so within ten days after receipt of this letter, addressing the Director of Personnel through this office.
*50 (b) By letter dated April 8, 1955, addressed to the Director of Personnel of the United States Treasury Department, plaintiff appealed the decision of the Acting Commissioner.
30. By letter dated July 20, 1955, plaintiff transmitted to the Bureau of Employees’ Compensation of the United States Department of Labor a statement dated July 21,1955, by plaintiff’s physician, Dr. W. K. Purks, reading as follows:
This is to state that Mr. Joe B. Everett of Vicksburg, Mississippi, 201 Lightcap Boulevard, has been under my medical care intermittently for several years and is known by me to have been disabled by reason of back injury and disc pathology, and unable to work since August 5,1954.
31. In a certificate dated September 19, 1955, plaintiff and plaintiff’s physician, Dr. B. B. Martin, both certified to the Bureau of Employees’ Compensation that plaintiff was totally disabled from August 27,1954, to September 19,1955.
32. The body of a letter dated December 16, 1955, addressed to plaintiff from the Director of Personnel of the United States Treasury Department, reads as follows:
Full consideration has been given to your appeal against removal from the Internal Revenue Service, including thorough review of records and careful weighing of oral representations. It was found the Internal Revenue Service had adequate basis for removing you and that the Civil Service Commission had approved the procedures followed in effecting your removal. Therefore, your appeal has been denied.
33. In a certificate dated July 3, 1956, plaintiff certified to the Bureau of Employees’ Compensation that he was totally disabled from August 11,1955, to July '3,1956.
34. (a) Plaintiff filed his petition in this court on June 14,1957.
(b) On August 22, 1957, there was issued by the Acting Commissioner of Internal Revenue a Notification of Personnel Action in which plaintiff was advised that effective August 26,1954, the reasons for his removal were amended to read as follows:
Failure to comply with existing agency instructions, unsatisfactory performance of duty with reference to securing information requested, and lack of cooperation with fellow employees.
*51 (c) On September 10,1957, a letter was directed to plaintiff from the Acting Commissioner of Internal Revenue, the body of which reads as follows:
In a recent review of your case with our Office of Chief Counsel, in connection with your pending action in the U.S. Court of Claims, I noted that the last Standard Form 50 which was issued to you lists two charges which I put aside in my decision of March 25,1955, to sustain your removal from the Internal Revenue Service.
To provide you with an up-to-date and complete record, I have attached an amended SF 50 indicatmg those charges which I consider sustained by the evidence and sufficient to require your removal. I considered charge 3 concerning the expired driver’s license to have been overcome by the evidence submitted in your defense. Charge 5 concerning the furnishing of conflicting statements in regard to the real-estate rentals was not considered sustained by the evidence in my review of the case.
I did find, however, that charges Nos. 1, 2, and 4 were supported by substantial evidence and, on the basis of these charges,! considered that your removal from the Revenue Service was fully warranted.
35. Under date of August 14, 1958, plaintiff certified to the Bureau of Employees’ Compensation that he had not been employed since August 1954. Plaintiff made a similar certification on August 25,1959.
36. The body of a letter dated August 4,1960, from plaintiff to the Bureau of Employees’ Compensation, reads as follows:
I wish to be advised as to why you withheld the fact that you had information on June 25, 1959 to the effect that I “had improved to the extent that I was no longer totally disabled” until July 20,1960, and what prompted your belated action.
It is possible I might have performed some limited task for a month or so last summer. A job for a person with my very limited physical ability on a temporary basis would be most difficult if not impossible to obtain.
My entire physical condition, and especially my back and knees, has steadily deteriorated for the past nine or ten months and more recently it has been necessary for me to take demerol and novocaine shots and capsules to obtain some relief for my back pains.
*52 My mobility is limited due to a slight numbness in my feet and legs, knee pains and limited control of my feet.
I was advised that fishing might be good for me. I tried it. It proved much too strenuous. I was advised swimming would help strengthen my back. I tried that with almost disastrous results. I was advised that I should try to do more walking. I tried this for several nights beginning with a couple blocks and increasing the distance a little each night. My last night about halfway back to my home a severe pain hit me in the back and I fell over a steel fence into the hedge in front of. a neighbor’s residence painfully injuring my back, both in the lumbo-sacral region and between my shoulders.
I do water my lawn when it needs it, but am positive at this time that further exertion would be very detrimental to my condition. It is imperative that I take periodic rests during the day and that I get off my feet immediately when my back begins to tire to avoid muscular spasms.
37. Under date of August 22, 1960, plaintiff certified to the Bureau of Employees’ Compensation that he had not worked since 1954, that he was 100 percent disabled as a result of his injury (of December 16,1958), that as a result of the injury his wage-earning capacity had been reduced 100 percent, and that in his then physical condition he was unable to do any work.
38. By letter dated August 24, 1960, addressed to the Bureau of Employees’ Compensation, plaintiff’s physician, Dr. E. E. Howard, Jr., expressed the opinion that plaintiff was unable to do any type of work and was totally disabled.
39. In a letter dated September 7, 1960, plaintiff’s physician, Dr. B. B. Martin, wrote to the Bureau of Employees’ Compensation in pertinent part as follows:
As you know Mr. Joe B. Everett has been under my treatment for a back condition for the past several years. A present examination of him reveals he is still disabled and continues to complain of pain in his lower back and some numbness in his lower extremities.
It is true he has tried to do light work and menial tasks about his home, etc., but each time that an attempt was made to work he has pains in his back and legs. He also states he has poor control of his lower extremities and is not able to walk in an easy manner.
*53 40. Under date of May 20, 1961, plaintiff certified to the Burean of Employees’ Compensation that he had not been employed during the preceding 12 months.
41. Under date of August 28, 1956, the Acting Director of the Bureau of Employees’ Compensation wrote with reference to plaintiff as follows:
The Bureau has determined Mr. Everett is entitled to compensation for temporary total disability for the period August 26,1954 — January 31,1955. He is also being paid compensation for temporary total disability for the period July 4-August 15,1956. * * *
42. Under date of September 15,1961, the Director of the Bureau of Employees’ Compensation wrote with reference to plaintiff as follows:
The Bureau’s file on Mr. Everett shows that he has been granted full compensation benefits on account of temporary total disability for the entire period during which he was disabled for work by the effects of his injury. He has received payment of compensation at the maximum rate allowable in his case for the period August 27,1954, to September 6,1961, inclusive.
$ # $ * $
The medical records on file in this case show that the disability is now confined to ten percent physical impairment of the body as a whole as a result of residual effects of the back injury and the spinal fusion. This disability is not of a degree which would prevent Mr. Everett from performing the duties required of a collection officer which is the position he held on the date of his injury. Since he is no longer disabled for the position which he occupied on the date of injury, he is not entitled to further payments of compensation on the basis of impaired wage-earning capacity. The Bureau’s notice of September 11, 1961, notified him of the termination of benefits and the reason for such action with the reminder that if he disagrees, it is his privilege to submit such medical evidence as he may wish considered for the purpose of showing a greater percentage of disability or that his present degree of disability disqualifies him for the duties of his former position.
43. Under date of September 19, 1961, plaintiff’s physician, Dr. B. B. Martin, wrote to plaintiff as follows:
Despite continued treatment, that is, Diathermy treatments to lower back, heat, sleeping on a very firm bed, *54 anodynes, when indicated, and muscle relaxants, you have not received much relief from the above signs and symptoms. In my opinion you will have to be under treatment for an indefinite period of time and that your injury-related disability still physically disqualifies you for the work you were doing when injured, or any type of work.
44. Under date of October 28, 1961, plaintiff’s physician, Dr. E. E. Howard, Jr., wrote to the Bureau of Employees’ Compensation in part as follows:
After re-examining the above patient but without X-ray evaluation I have reached the same conclusion, relative to Mr. Everett’s physical condition. In my opinion Mr. Everett is disabled and is not capable of doing physical work which would require even moderate activity.
45. The body of a letter dated December 8,1981, addressed to plaintiff from the Bureau of Employees’ Compensation, reads as follows:
The reports which have been received show that you are in need of treatment for your employment-related injuries. This consists of daily formal physiotherapy treatment to improve your muscular structure.
You are still not shown to be totally disabled but the treatment will cause you to be partially disabled for full time employment during the period therof. Within a few days the U.S. Treasury will send you a check for $242.58 representing the compensation due you for this partial disability from September 7 to December 6,1961. With this check you will receive a form on which to file claim for continuing compensation. Prompt consideration will be given tins claim when received.
46. Under date of December 28, 1961, plaintiff certified to the Bureau of Employees’ Compensation that he was totally disabled from September 7, 1961, to December 28, 1961, on account of the injury he sustained on December 16, 1953. Plaintiff transmitted with his certificate a certificate, dated December 19, 1961, of his physician, Dr. Solomon Winokur, who stated that plaintiff was then totally disabled for usual work and that plaintiff was not able to perform other work.
*55 47. Under date of January 19, 1962, the Bureau of Employees’ Compensation wrote plaintiff’s physician, Dr. Solomon Winokur, in part as follows:
You may consider this letter your authority to provide medical supervision and conservative treatment for a period of four months. At the end of that time, we will appreciate receiving a summarizing report.
48. Under date of March 26, 1962, plaintiff certified to the Bureau of Employees’ Compensation that he was totally disabled from January 15, 1962, to March 26, 1962, on account of the injury he sustained on December 16,1953. Plaintiff transmitted with his certificate a certificate, dated March 12,1962, of his physician, Dr. Solomon Winokur, who stated that plaintiff was then totally disabled for usual work. Dr. Winokur expressed the opinion that plaintiff’s disability would continue for several months.
49. Under date of April 30, 1962, plaintiff certified to the Bureau of Employees’ Compensation that he was totally disabled from March 26, 1962, to April 30,1962, on account of the injury he sustained on December 16, 1953. Plaintiff transmitted with his certificate a certificate, dated April 23, 1962, of his physician, Dr. Solomon Winokur, who stated that plaintiff was totally disabled for usual work and that plaintiff was unable to perform other work. Dr. Winokur expressed the opinion that plaintiff’s disability would continue for several months.
50. (a) Under date of November 9, 1962, plaintiff received a letter from the Bureau of Employees’ Compensation, which read in part:
Payment has been authorized to you for the period September 6,1962, to October 31,1962.
However, the medical evidence presently of record does not show any basis for paying further compensation. The evidence shows that you are capable of light duty and this type duty would be in keeping with your position as a Revenue Agent. Accordingly further claims for compensation will not be paid.
(b) In a letter dated February 27, 1964, the Bureau of Employees’ Compensation wrote plaintiff in part as follows:
We have today certified payment to you in the amount of $1,878.16. This represents accrued compensation for *56 the period November 1, 1962, to February 19, 1964. While the evidence of record shows that you are disabled for your date-of-injury position as a Collection Officer, it also clearly indicates that you are not and have not been totally disabled since October 31, 1962.
When a partially disabled employee has no actual earnings, the law requires the Bureau to determine a wage-earning capacity which appears reasonable under the circumstances, giving consideration to the nature of the injury-related disability, the degree of physical impairment caused by the injury, his usual employment and other factors or circumstances in the case which may affect his capacity to earn wages. The Bureau has determined that you are entitled to benefits for the loss of wage-earning capacity you sustained as a result of the injury of December 16, 1953. While you are unable to return to work as a Collection Officer, which presently pays $126.44 per week, you are physically able and qualified by education and experience to perform work as an Accounting Clerk and earn $80 a week. This has resulted in a 37 percent loss of wage-earning capacity and in monetary benefits of $27.62 each week, or $110.48 each four weeks.
Accordingly, you will in addition to the accrued compensation stated, receive $110.48 each four weeks. The first check in this amount will be on March 18,1964.
(c) Under date of May 4, 1964, plaintiff certified to the Bureau of Employees’ Compensation that he was totally disabled as of that date, on account of the injury he sustained on December 16, 1953, and its aggravation by an auto accident on February 11, 1963. Plaintiff transmitted with his certificate a certificate, dated May 2, 1964, of his physician, Dr. B. B. Martin, who stated that plaintiff was then totally disabled for usual work and unable to perform other work. Dr. Martin expressed the opinion that plaintiff might be able to do light desk work in the near future with the aid of a brace.
(d) Plaintiff received a letter dated September 10, 1964, from the Bureau of Employees’ Compensation, stating in part:
Based on information obtained by our field representative and the additional opinion furnished by Dr. Sobo-loff, the Bureau has determined that you were totally disabled until furnished the back support.
*57 On September 11, 1964, the amount of $1,945.96 is being authorized for payment to you representing the adjustment in compensation for the period November 1, 1962, to May 18,1964, inclusive, to allow temporary total disability less the amount paid you for the same period. The earning capacity award previously explained to you has been made effective May 19,1964, the day after you obtained the support. You will continue to receive the amount of $103.01 each four weeks until otherwise notified.
(e) From August 26, 1954, the date of his removal, until May 18,1964, plaintiff was paid compensation under the provisions of the Federal Employees’ Compensation Act for total disability resulting from the injury he sustained on December 16, 1953. From May 18, 1964, to date, plaintiff has received compensation of $103.01 each four weeks for partial disability, the computation of which is based on plaintiff’s ability to perform sedentary work as an accounting clerk.
51. Defendant offered no oral testimony at the trial.
52. (a) Under date of October 27, 1953, there was issued by the Assistant Commissioner of Internal Revenue a memorandum for Regional Commissioners, Regional Inspectors, and the Chief of the Processing Branch on the subject of Procedures for Adverse Actions. This memorandum, which was in effect at all pertinent times, reads in part as follows:
* * * Adverse actions will be handled in accordance with the following policy and procedures. * * *
I. Definitions
An adverse action is a personnel action which effects a removal for cause, involuntary separation, suspension, demotion or reduction in rank. It also includes warnings, reprimands, and admonishments.
An adverse action may be taken to remove or otherwise discipline an employee for misconduct or may be taken for non-disciplinary reasons.
II. Adverse Actions (Disciplinary)
1. Purpose of discipline
‡ $ $ $ $
Discipline must be fair and just; like penalties must be given for like offenses, with due consideration for mitigating or aggravating circumstances in each case.
*58 The decision as to what disciplinary action should be taken in each case must be based on a careful evaluation of the nature of the misconduct, the effect on the Service, and the effect on the individual as an employee.
‡ $ # ‘ $ $
3.Responsibilities
The Regional Commissioners are responsible for the administration of discipline, throughout their Regions. Responsibility for the discipline of employees under their supervision must be shared by all operating officials and supervisors. Supervisors must by precept and example provide the leadership which will result in acceptable conduct and satisfactory performance of duties on the part of the employees working under their direction.
Sji # * * *
Administrative actions which may later become material factors in discipline, e.g. oral warnings and instructions to employees, must be made a matter of record. Oral warnings should always be backed up with memo-randa for the personnel files with a copy to the person warned.
If, after proper instruction and guidance an employee cannot or will not perform efficiently or will not conduct himself in an acceptable manner, the responsible supervisor must recommend promptly to appropriate authority suitable disciplinary action.
*{t 5¡! í|*
4. Plans and procedures
Disciplinary plans and procedures should provide for (1) fully informing all employees of the standards of conduct, (2) defining the specific responsibilities of supervisors, (3) procedures insuring prompt action (without unnecessary delay), (4) an opportunity for employees to present their case and (5) thorough investigation and adequate documentation of evidence, and (6) a suitable record of actions proposed and taken.
‡ ^ ‡
5. Standards of Conduct
The basic standards of conduct are contained in “Rules of Conduct and Other Instructions for Employees of the Internal Revenue Service,” March 1952 issue.
There is attached a schedule of offenses and penalties which may be used as a guide and may be helpful in *59 achieving an equitable and uniform administration of discipline. This guide should not be applied automatically; lesser or greater penalties than indicated by the guide may and should be given if warranted by the circumstances of the individual case. * * *
* $ $ $ $
III. Adverse Actions {Non-disciplinary)
Non-diseiplinary adverse actions include separations, demotions, or reductions in rank, occasioned by unsatisfactory service, reduction in force, disability, or reclassification.
# * j}: # %
An adverse action based on unsatisfactory service or inefficiency may and should be taken' independently of the Performance Eating Act, if the facts warrant the action. Such an action is consistent with a current satisfactory rating; e.g., in the case of an individual whose service since the last rating period can be demonstrated to be clearly unsatisfactory, in spite of proper supervision and instruction.
*****
B. Notice of proposed adverse action
‡ ‡ ‡ ‡ )[:
3. The Charges must be stated specifically and in detail; e.g., the exact nature of each violation, the date of each, and the place where each occurred. All the charges on which an adverse action ultimately rests must be included in the notice of proposed action since an adverse action may be based only on the reasons which were given in the notice to which the employee had opportunity to reply.
(b) The Schedule of Certain Disciplinary Offenses and Penalties for Civilian Employees in the Internal Kevenue Service, attached to the memorandum, reads in part as follows:

*60

*61 53. The letter of charges dated July 26, 1954, bases the removal of plaintiff upon five “specific charges” as follows:
(1) Engaging in outside employment without written permission. This charge does not refer to plaintiff’s real estate, which is the subject of charge 5. Whether plaintiff’s connections with the Magee Auto Supply Company or with the College Education Insurance Fund did or did not constitute “engaging in outside employment”, it is clear that plaintiff’s failure to obtain written permission to “engage in outside employment” was based on a good faith interpretation by him, as well as by his superiors to whom he had made full disclosure, prior to March 1952, that he was not so engaged. Hence, it was reasonable for plaintiff to conclude that he would not need to obtain the written permission prescribed in the Hules of Conduct published in March 1952. Plaintiff was not warned nor was he properly instructed in accordance with the Procedures for Adverse Actions respecting the necessity (if such necessity existed) for him to obtain written permission to continue his aforementioned connections after March 1952. The penalty for engaging in outside employment, except prohibited employment, contained in the Schedule attached to the above-mentioned Procedures for Adverse Actions does not include removal.
(2) Unsatisfactory performance of duties. The charge respecting the quotation in a letter by plaintiff of a “Mr.” Day instead of a “Mrs.” Day stems from an obvious typographical error. The comment by plaintiff, alluded to in the charge, respecting the drinking by Mr. Day was clearly pertinent and reasonable. The procedure suggested by plaintiff in the processing of the case of the deceased Mr. Stamps was reasonable and in accordance with normal office procedure of the Internal Revenue Service in such cases. There is no substantial evidence to sustain a conclusion that plaintiff unsatisfactorily performed his duties. On the contrary, the evidence clearly establishes that plaintiff’s performance of his duties was over all highly satisfactory.
(3) Driving an automobile on official business with .an expired driver's license. As heretofore noted (findings 24 and 34(c)), it was subsequently administratively found that *62 this charge was overcome by evidence submitted in plaintiff’s defense.
(4) Lacle of cooperation with fellow employees. The sole incident referred to in the letter of charges was of a trivial nature. There is no substantial evidence to sustain a conclusion that plaintiff lacked cooperation with his fellow employees. On the contrary, the evidence clearly establishes that plaintiff’s cooperation with his fellow employees was excellent.
' (5) Furnishing conflicting statements with regard to management of real estate. As heretofore noted (finding 34(c)), it was subsequently administratively found that this charge was not considered sustained by the evidence.
54. Based on the entire record of the case (the administrative record as augmented by the record at the trial), it is found that the removal of plaintiff by the Internal Revenue Service was arbitrary and capricious.
55. It is also found that since August 26,1954, the date of his removal, plaintiff has been incapacitated from performing the duties of the position from which he was removed, and that from August 26,1954, until May 18,1964, he was totally disabled from undertaking any work for the Federal Government for which he was qualified.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is entitled to recover on account of his lost sick leave, in accordance with the opinion, and judgment is entered to that effect. The amount of recovery will be determined pursuant to Rule 47(c). Otherwise the petition is dismissed.
In accordance with the opinion of the court and a memorandum report of the commissioner as to the amount due thereunder, it was ordered on April 19, 1965, that judgment for the plaintiff be entered for $300.08.

 The Lloyd-LaFollette Act, 37 Stat. 555, U.S.C. § 652(a), originally enacted in 1912, provides: “No person in the classified civil service of the united States shall be removed or suspended without pay therefrom except for such cause as will promote the efficiency of such service * * This section prohibits removal from office on illegal, arbitrary, or capricious grounds. E.g., Gadsden v. United States, 111 Ct. Cl. 487, 78 F. Supp. 126 (1948). An employee found to have been improperly discharged is entitled to “compensation at the rate received on the date of such removal or suspension, for the period for which he received no compensation with respect to the position from which he was removed or suspended, less any amounts earned by him through other employment during such period * * 62 Stat. 354, 355, 5 U.S.C. § 652(b)(1).

 Section 7 has since been amended to provide that the statutory remedy conferred by the Employees’ Compensation Act is exclusive. 63 Stat. 861-62, 5 U.S.C. § 757(b). See Weyerhaeuser Steamship Co. v. United States, 372 U.S. 597, 601 (1963).

 Relief under 5 U.S.C. § 652(b)(1) (see note 1 supra) may not give the aggrieved party the exact amount he would have earned had he not been wrongfully discharged, since it provides for compensation at the rate received on the date of discharge and has been held not to permit recovery for salary increases or for the value of annual leave during the period of removal. Schaller v. United States, 160 Ct. Cl. 174, 311 F. 2d 796 (1963).

 üp to May 1964, the Bureau always receded, finally, from its tentative suggestions that plaintiff was no longer totally disabled or not disabled at all. Conversely, plaintiff always succeeded, up to May 1964, in ultimately convincing the Bureau that he was totally disabled and therefore in ultimately receiving total disability compensation for the entire period from 1954 to May 1964.

 Applications to the Bureau of Employees’ Compensation for disability payments must include the certification of the employee’s physician that he is in fact disabled. Question 5 of the physician’s form of certification asks : “Is disability total for usual work?” Question 10 is: “Is claimant, in your opinion, able to perform other work?” In plaintiff’s May 4, 1964, application for total disability, his physician answered question 5 affirmatively and question 10 in the negative.

 In Armand v. United States, supra, 136 Ct. Cl at 343, plaintiff received a pension from the Veterans Administration based on a disability rating of 100 percent during the period for which he requested relief for improper dismissal. Because “the only evidence in support of plaintiff’s ability to perform [was] his own testimony to that effect, together with the fact that during the period he periodically requested the Navy to reinstate him,” the court denied recovery.

 Plaintiff asserts that the Civil Service Commission has a program through ■which it attempts to place partially disabled government employees in less exacting positions. But such individuals are not necessarily given priority over other job applicants by employing agencies within the Government, and, if reemployed, they lose their rights to disability retirement pay. In these circumstances, plaintiff has not shown that he suffered financial injury by his inability to use what amounts to one free employment agency operated by the Federal Government.

 We are, of course, not authorized to inflict a monetary penalty on the Government in such circumstances.

 Plaintiff also implies that our prior denial of the defendant’s motion for summary judgment, based on the disability defense, resolved that issue in plaintiff’s favor. The denial was of both plaintiff’s and defendant’s motions for summary judgment, and it was made by order without opinion. It was by no means a determination on the merits, but was intended to allow the facts to be developed by a trial before the merits were decided.