Whitaker, Senior Judge,
delivered the opinion of the court:
Plaintiff, a non-veteran, sues for his salary in grade GS-1152-12 from June 8, 1959 until March 20, 1961, less such amounts as he may have received during this time in Civil Service retirement benefits, on the ground that his discharge was in violation of applicable regulations of the Department. After defendant answered, the case was tried before Trial Commissioner W. Ney Evans, who filed his report on March 4, 1965, and the case is now before the court on exceptions to that report and for final judgment.
On May 6, 1959, the Chief, Employee Servicing Branch, Industrial Relations Office, of the agency in which plaintiff was employed, forwarded to him formal notice stating that
* * * decreased work activities require a reduction in the number of employees in your competitive level. Your name has been reached on the retention register. Therefore, you will be involuntarily separated from the service because of reduction in force. Your last day in an active work status will be 8 Jun 1959 * * *.
This notice did not specify the position held by plaintiff, by job number or otherwise, which would be eliminated pursuant to the reduction in force, but the official Notification of Personnel Action dated June 6, 1959, did specify the job number as 8471. Plaintiff claims that he had never been validly assigned to Job No. 8471 and therefore the abolition of that job number did not effect his separation from the Service. His claim is based on nothing more than a bare technicality; it is without merit and cannot be sustained.
Whether or not plaintiff had been validly assigned to the job specified in the Notification of Personnel Action, plaintiff knew that the purport of the notice he received was to *71 separate him from the Service and from whatever job he held in the Service. It is only his separation from the Service that can give plaintiff a right of action. A possibly invalid reassignment of jobs caused plaintiff no financial loss and, hence, is no ground for the award of a monetary judgment. Nor was the reassignment the reason for his separation. He and a Mr. Partridge were in the same grade and in the same competitive level, hut plaintiff was junior in length of service to Mr. Partridge and, therefore, his name was reached prior to Mr. Partridge’s on the retention register. This was the reason for his separation.
Plaintiff claims that in 195.0 he had been assigned the job which made him head of the unit to which he and Mr. Partridge were assigned; that he had never been validly reassigned to any other position; that this administrative superiority outweighs Mr. Partridge’s seniority in length of service and, hence, Mr. Partridge should have been separated instead of him. This is not the basis for the make-up retention registers. This register was prepared on the basis of length of service, which is in conformity with the regulations, and, since Mr. Partridge had longer service than plaintiff, plaintiff’s name was reached before Mr. Partridge’s.
This dispute had its genesis in June 1956 when an Operational Rations Unit was established within plaintiff’s agency. This new unit was to be staffed by two GS-12 Industrial Specialists and a Clerk-Stenographer. Plaintiff and one C. E. Partridge, also a non-veteran, were assigned to the Industrial Specialists’ positions. However, for a reason not clear from the record, plaintiff was vested with administrative control of the unit despite the fact that Partridge was his senior in years of Federal service. In January 1957 new job descriptions were prepared for both plaintiff’s and Partridge’s positions. The titles to both positions were changed from Industrial Specialist (Subsistence) to Production Facilities Specialist (Subsistence). Plaintiff was assigned to Job No. 6941, and Partridge to Job No. 6942. Plaintiff once again was vested with administrative control of the unit. Otherwise, except as to geographical areas to be serviced, both plaintiff and Partridge were to perform identical duties, i.e., to survey and analyze subsistence and related sub *72 sistence facilities within a designated geographic area of the Philadelphia District Office.
In July 1957, Lt. Col. George H. Franklin was assigned to the Philadelphia Industrial Mobilization Planning Office as Chief of the Industrial Mobilization Office of the Purchasing Division, and Major John D. Lawton was assigned as Chief of the Industrial Services Section of the Industrial Mobilization Office. The effect of these assignments was to make Major Lawton plaintiff’s immediate administrative superior, and Lt. Col. Franklin, Major Lawton’s immediate administrative superior. After Lt. Col. Franklin and Maj or Lawton had occupied their positions for about six months, Major Lawton stated to Lt. Col. Franklin that he could not understand why plaintiff had been placed in charge of the Operational Eations Unit when Partridge was senior in Federal service, and in his opinion could do a better job. However, no change was made at that time, but in the spring of 1958 the two officers decided to try an exchange on a detail basis.[1] To that end Major Lawton, on April 1, 1958, issued a Disposition Form which provided:
1. Effective this date Mr. Charles Partridge is detailed as Acting Chief Operational Eations Unit this Section. This detail is for a period of 6 months. It is the opinion of the undersigned that Mr. Partridge should assume the responsibility temporarily as a means of be' coming completely familiar with the entire operation of this unit.
2. All correspondence prepared and submitted by the Operational Eations Unit will be cleared by both Mr. Graves [plaintiff] and Mr. Partridge.
3. All correspondence of an official nature will. be prepared for the signature of the Chief of the Services Section.
When the detail expired, on October 3, 1958, plaintiff resumed his position as administrative head of the unit.
At the end of October 1958, the job descriptions covering the two Production Facilities Specialists (Subsistence) were again rewritten. One was designated Job No. 8470, the other Job No. 8471. As was true under the former j ob descriptions for the Production Facilities Specialists (Subsistence), the *73 two positions were virtually identical except that one position involved in addition tbe duties incident to administrative control of tbe unit.
Following this, on January 22, 1959, a personnel officer issued Notifications of Personnel Action to Partridge and plaintiff, advising Partridge that he was reassigned, effective January 25, 1959, from Job No. 6942 to Job No. 8470, and advising plaintiff that, effective January 25, 1959, he was reassigned from Job No. 6941 to Job No. 8471. Since Job No. 8470 carried with it the duties of administrative control of the unit, the end result of the reassignment was to effect an exchange in administrative control of the unit. Otherwise, the duties of each man were unchanged.
On January 26, 1959, at about 4: 30 p.m., upon return to his desk, plaintiff found the Notification of Personnel Action reassigning him to Job No. 8471. Prior to this time he had received no written notification of the proposed reassignment. He hurriedly glanced through the notification, and then went in search of Colonel Lawton.[2] When he was unable to find him, he went to the office of Colonel Franklin and talked to him about it. According to plaintiff’s testimony, Colonel Franklin professed surprise that the action had been taken, and suggested to plaintiff that the notification document be left with him,[3] which plaintiff did, after which he never again saw the reassignment order or the job description of Job No. 8471.
Prior to the issuance of these notices, to wit, on January 20, 1959, and before plaintiff had been notified of his assignment to Job No. 8471, Colonel Franklin had a conference in his office with plaintiff, Partridge, and Colonel Lawton, at which he informed the group that a reduction in force was in prospect and that if it occurred, plaintiff would have to go since he was junior to Partridge. At this time plaintiff was acting as the head of his unit and as the administrative superior of Partridge. After plaintiff had been notified of his reassignment, he wrote Colonel Franklin as follows:
*74 On 20 January, 1959 you advised me that it had become necessary to reduce the force in your offices by one person and that, because it had been determined that one man could do the work of the Operational Eations Unit, I would be riffed. I accepted that decision and considered it a promise of action. Will you please tell me what the effective date of my separation is to be ?
I will waive any further advance notice of this action. If it can be made immediate I will appreciate the favor. That would also result in a further saving of money for the Army.
On January 27, 1959, plaintiff began an extended period of sick leave. He remained on sick leave from January 27, 1959 to June 8,1959, the date his separation from the Service became effective.
On June 14,1959, after receipt of the notice of his separation, plaintiff wrote to the Director, Third Civil Service Eegion, Philadelphia, appealing the separation action on the following grounds:
(A) An order dated 18 June, 1956 * * * established an Operational Eations Unit in the Serv Section and vested administrative control of the unit in me.
My job description, dated 23 January, 1957 which has not been changed since that date, delegates administrative authority in the Operational Eations Unit to me.
It is my contention that these factors outweigh seniority in service and that my subordinate should have been separated in the reduction in force rather than me.
(B) Standard Form 50, Notification of Personnel Action (separation due to reduction in force) dated 6/4/59 is official notice of my separation from Job #8471. I have never had notice of a change in my job to #8471 so I could not be separated from that j ob. The action is invalid.
Upon receipt of plaintiff’s appeal the Eegional Director of Civil Service in Philadelphia made inquiry of plaintiff’s agency. After familiarizing himself with the facts and circumstances surrounding plaintiff’s separation, the Acting Eegional Director wrote plaintiff on August 5,1959, informing 'him that it was the Eegion’s opinion that his separation due to the reduction in force was proper.
On August 13,1959, plaintiff appealed this decision to the Civil Service Board of Appeals and Eeview on primarily the *75 same grounds as those contended before the Philadelphia Regional Director. Thereafter, on several occasions, plaintiff wrote to the Chairman of the Board of Appeals and Review supplementing his appeal.
On November 27, 1959, the Chairman of the Board of Appeals and Review wrote plaintiff in part as fallows:
The evidence in your appeal file establishes that you were in retention subgroup I-B with 11 retention credits and that on the basis of your retention standing in the competitive level of Production Facilities Specialist (Subsistence), GS-1152-12, you were properly within reach for reduction-in-force action. The notice of the adverse action is found to have been both timely and adequate and in accordance with the provisions of the Retention Preference Regulations. * * *
With reference to plaintiff’s claim that he had never been validly assigned to Job No. 8471, the Board of Appeals and Review said:
Other evidence in the appeal file, more relevant to the reduction-in-force aspects of your case, establishes that the position from which you were separated was fundamentally the same position you held prior to January 25, 1959, the date you received notice of a change in your position. The position from which you were separated on June 8, 1959, was listed, for reduction-in-force purposes, in competitive level 12-27. Your position had been listed in competitive level 12-27 since February 28, 1958, when the retention register bearing your name and that of Mr. Charles E. Partridge was prepared. This evidence establishes that your position has, for reduction-in-force purposes, remained unchanged since February 28, 1958, irrespective of the renumbering of your job sheet on January 25,1959 or of any revision of your duties and responsibilities as you have alleged.
Plaintiff then petitioned the Civil Service Commission for review of the decision of the Board of Appeals and Review. After an exchange of correspondence between plaintiff and various officials of the Civil Service Commission, plaintiff was advised on February 13, 1961, that his administrative remedies had been exhausted when the Board of Appeals and Review affirmed the decision of the Third Regional Office, and that he had “no enforceable right to further consideration * * * within the Commission.”
*76 We agree with the action of the Board of Appeals and Be-view of the Civil Service Commission ,and plaintiff’s petition must be dismissed for the reason stated by it. But for still another reason, we do not think plaintiff is entitled to recover.
On December 14, 1959, plaintiff filed application with the Civil Service retirement system for retirement for total disability. He stated that he became totally disabled on January 26,19;59¡- In support of his contention of total disability he described his disorders as heart damage incurred in an accident while on official business in 1956, and Parkinsonism and torticollis, which had been progressive since 1942. Plaintiff’s physician certified that he had the disorders which he alleged; that the fatigue and tension occasioned by the 30 percent travel time, mostly by automobile, involved in plaintiff’s duties, aggravated the Parkinson and heart condition, and that plaintiff was totally disabled from his present occupation as of January 26,1959.
The application was approved and plaintiff’s disability retirement was made effective as of June 9, 195.9. He has received disability retirement benefits of $153 per month since that date.
On March 20, 1961, plaintiff w,as employed by the Small Business Administration on the basis of “Beinstatement (Career) (Beemployed Annuitant)” as an Industrial Specialist (General Procurement), grade GS-12, salary $10,255 per year, less disability annuity. Plaintiff was still so employed at the time of trial.
It has long 'been the rule in this court that back pay for improper dismissal will be denied where the employee is not ready, willing and able to resume his position during the period for which relief is sought. Everett v. United States, 169 Ct. Cl. 11, 340 F. 2d 352 (1965) ; Corrigan v. United States, 153 Ct. Cl. 392 (1961) ; Armand v. United States, 136 Ct. Cl. 339 (1956).
Plaintiff testified at the trial that he was ready, willing and able during all times relevant to resume his position. However, on December 14,1959, plaintiff applied to the Civil Service retirement system for total disability compensation. The application was approved and he began to receive retirement compensation for total disability as of June 9, 1959. *77 He bas continued to receive it throughout the entire period for which he now seeks back pay. This grant of retirement compensation was premised on the agency’s determination of plaintiff’s total disability and complete inability to perform his normal work. This is what plaintiff claimed and what the agency found. Unless this is demonstrated to be clearly wrong, we will not disturb it. Everett v. United /States, sufra, at 18. Plaintiff says that his employment by the Small Business Administration shows that the determination of total disability was erroneous. We are of opinion, however, that this by itself does not show that it was plainly wrong, in light of the fact that plaintiff was employed by the Small Business Administration on the basis of “Reinstatement (Career) (Reemployed Annuitant) ” and has continued to receive his disability retirement pay throughout his employment with the Small Business Administration. We are not convinced the determination of the agency was clearly wrong. Plaintiff cannot claim total disability when it suite his purpose to do so and then about-face and claim the opposite when this suits his purpose.
It follows that plaintiff’s receipt of total disability compensation from his separation in June of 1959 to March of 1961 precludes a finding that he would have been able to discharge his duties with the Department of the Army during any part of that period.
For the foregoing reasons, we are of opinion that plaintiff is not entitled to recover. His petition is hereby dismissed.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner W. Ney Evans, and the briefs of the parties, makes findings of fact as follows:
1. (a) Plaintiff[1] was employed in the Department of Agriculture from September 23, 1943, to November 1, 1944; and by the Maritime Commission from April 15, 1946, to July 31, 1947.
*78 (b) He has no veterans’ preference, never having served in the Armed Forces.
(c) On November 15, 1948, he received a temporary appointment as Industrial Specialist (Subsistence), in the Philadelphia Industrial Mobilization Planning Office, Philadelphia Quartermaster Depot, of the War Department.[2]
(d) Sometime thereafter, his appointment in the classified civil service was made permanent[3] and he was promoted to grade GS-12.[4]
(e) He now sues to recover an amount representing loss of earnings for the period from June 8, 1959, to March 20, 1961,[5] on the ground that his purported separation from his civilian position in the Department of the Army was invalid because in violation of his rights under statutes and regulations pertaining to his employment.
2. (a) On June 18, 1956, by appropriate administrative order, there was established an Operational Rations Unit within the Services Section of the Industrial Mobilization Office of the Purchasing Division of the agency by which plaintiff was employed.[6]
(b) The order specified that “currently, the Operational Rations Unit will be staffed as follows
Position: One Operational Rations Specialist, Job No. 3471; Classification and Grade, Industrial Specialist GS-1150-12; Incumbent, R. 0. Graves.
Position: One Operational Rations Specialist, Job No. 3714; Classification and Grade, Industrial Specialist, GS-1150-12; Incumbent, C. E. Partridge.
Position: One Clerk-Stenographer, Job No. 3915; Classification and Grade, Clerk-Stenographer, GS-312-3; Incumbent [not named].
(c) The order further provided:
*79 * * * The administrative control of the Operational Rations Unit is vested in Mr. Graves, who will report for this unit to the Chief, Services Section.
(d) Mr. Partridge, who was assigned to the Operational Rations Unit in Job No. 3714, with the same classification and grade as plaintiff (in Job No. 3471), but subject to plaintiff’s administrative control of the unit, was senior to plaintiff in years of Federal service. Mr. Partridge, like plaintiff, did not have veterans’ preference.
3. (a) As of January 23, 1957, a new job description (given Job No. 6941) was prepared to cover the work being done by plaintiff. The concluding sentence of the second paragraph read as follows:
Serves as the focal point between the District and Mssa relative to administrative and operational aspects of the program.[7]
(b) The concluding paragraph of the job description read as follows:
5. Provides administrative services and coordinates activities of the Operational Rations TJnit: For administrative purposes only, is delegated authority to serve as focal point between the District officials and mssa planning authority on operational ration matters; to receive and distribute work projects; to relay policy and regulatory matter emanating from higher authority to Production Facilities Specialist of equal grade. Confers with Production Facilities Specialist on joint operational matters in order to reach a common understanding or interpretation of policy or procedural changes or determine effect such changes have on program areas assigned. Compiles and submits coordinated recommendations, or replies to correspondence received from higher authority, relative to technical planning matters in respective program areas. Presents coordinated reports relative to work projects, current status of actions, and administrative needs of the subsistence program to District Officials, either orally or in writing, and keeps them apprised of problematic areas encountered and the approach taken to overcome difficulties. Assures that sufficient clerical assistance is obtained to accomplish the needs of the program.
*80 (o) Effective February 10, 1957, plaintiff was formally reassigned to Job No. 6941 (from Job No. 3471) and Ms position title was changed from “Industrial Specialist (Subsistence)” to “Production Facilities Specialist (Subsistence)
(d) As of January 3, 1957, a new job description (given Job No. 6942) was prepared to cover the work being done by Mr. Partridge. This job description did not contain the sentence quoted in subparagraph (a) or the paragraph quoted in subparagraph (b) of this finding. Instead, the concluding sentence of the opening paragraph of the description of Job No. 6942 was as follows:
Work assignments are relayed to incumbent by Production Specialist of equal grade.
(e) Otherwise, the two job descriptions (for Nos. 6941 and 6942) were virtually identical, except as to geographical areas to be serviced by the incumbents. In each instance, the incumbent was to survey and analyze subsistence and related subsistence facilities within a designated geographic area of the Philadelphia District Office. The performance of these duties required substantial amounts of travel.
(f) Mr. Partridge was reassigned to Job No. 6942 (from Job No. 3714), and his position title was changed from “Industrial Specialist (Subsistence)” to “Production Facilities Specialist (Subsistence).”
4. In July 1957, Lt. Col. George II. Franklin and Maj. John D. Lawton were assigned to the Philadelphia Industrial Mobilization Planning Office in the positions of Chief of the Industrial Mobilization Office of the Purchasing Division (Colonel Franklin) and Chief of the Industrial Services Section of the Industrial Mobilization Office (Major Lawton). The Operational Rations Unit (sometimes referred to as the Subsistence Unit) was part of the Industrial Services Unit. Major Lawton therefore became plaintiff’s immediate administrative superior, while Colonel Franklin was Major Lawton’s immediate administrative superior.
5. (a) On October 29, 1957, plaintiff addressed a memorandum “To: Chicago mssa; Att’n * * * Chief, Indus. Mob. From: R. C, Graves, Chief, Operational Rations Unit, *81 Phila. QM Depot” on the “Subject: Workload Estimate and Recommendations for CY 58.” Following are the opening and closing paragraphs of the memorandum:
* * * Review of the prospective workload for this unit during the coming year indicates that the number of individuals assigned to the unit should be reduced from two to one and that a more economical and efficient operation would result. Evidence and data supporting this conclusion are detailed in succeeding paragraphs.
* * * If this reduction is to be made it is requested that steps be taken to assure replacement of the individual rifled in a suitable position where his talents will be available to the QM Corps.
(b) At the time this memorandum was prepared, plaintiff knew that Mr. Partridge was senior to him in years of Federal service and therefore occupied a superior place on the retention register.
6. As of December 13, 1957, the applicable Civilian Personnel Regulations[8] of the Department of the Army contained the following provisions relating to Reassignments:
USE OE REASSIGNMENT
5-2. A reassignment in either the competitive or expected [sic] [excepted] service will be effected when an employee is to be regularly assigned, without promotion or change to lower grade, to another position identified with a different job, or to another position within the same job in a different major organizational segment. * * * Ordinarily, reassignments are effected at the request of the employee or are arranged with his consent. However, when the needs of the service require, a reassignment may be ordered on an involuntary basis as discussed in a below. * * *

Involuntary Reassignments

a. While an involuntary reassignment is not in itself an adverse action unless it involves a reduction in ra/nk or compensation, the employee will be given an advance notice whenever such action is proposed. The advance notice will state the reasons for the proposed action and why the employee toas selected. Additionally, the no *82 tice will give the employee an opportunity to reply giving reasons why he should not be reassigned. If, after consideration of any reply, decision is made to effect the reassignment and the employee refuses to accept, the refusal may serve as a basis for appropriate action under the provisions of CPE SI. * * * [Emphasis supplied.]
* * $ ❖ *
STATUS FOLLOWING REASSIGNMENT

Duration

5-4. a. Eeassignments are effected without time limitation. Where circumstances require the service of the employee in a different position on a strictly temporary basis, a detail will be effected. (See CPE D2).
$ $ # $ $
7. (a) After Colonel Franklin and Major Lawton had been occupied with their assignments in the agency for a period of 6 months or so, Major Lawton spoke to Colonel Franklin of his concern about the work in the Operational Eations Unit. Major Lawton could not understand why plaintiff had been placed in charge of the Unit instead of his contemporary (Mr. Partridge), who was senior to plaintiff in Federal service. Major Lawton also indicated to Colonel Franklin his opinion that Mr. Partridge could do a better job.
(b) Sometime in the early spring of 1958, the two officers again discussed the situation. Major Lawton wanted to place Mr. Partridge in charge of the Unit. The decision, however, was to try the exchange on a detail basis. A detail is a less formal change in organization and personnel action than a reassignment. As used by this agency, details were normally made on a 6-month basis. The action was therefore of a temporary nature for a specified length of time.
(c) On March 12,1958, Major Lawton issued a Disposition Form to plaintiff and Mr. Partridge as follows:
1. Effective this date Mr. Charles Partridge is designated Acting Chief Operational Eations Unit this section. It is felt that Mr. Partridge, who is the senior GS-12, should assume this position as a means of becoming completely familiar with the entire operation of this unit.
*83 2. All correspondence prepared and submitted by the Operational Rations Unit will be cleared by both Mr. Graves and Mr. Partridge.
3. Mr. Partridge will represent this Unit at conferences, meetings, etc. unless absent from the office or Mr. Graves is specifically requested.
4. All correspondence of an official nature will be prepared for the signature of the Chief of the Services Section.
5. This is not intended to demote anyone but rather to assign the responsibility where it belongs and again to familiarize Mr. Partridge with the entire operation.
* * * * Ü:
(d) On April 1,1958, Major Lawton issued a revision of the foregoing Disposition Form, as follows:
1. Effective this date Mr. Charles Partridge is detailed as Acting Chief Operational Rations Unit this Section. This detail is for a period of 6 months. It is the opinion of the undersigned that Mr. Partridge should assume this responsibility temporarily as a means of becoming completely familiar with the entire operation of this unit.
2. All correspondence prepared and submitted by the Operational Rations Unit will be cleared by both Mr. Graves and Mr. Partridge.
3. All correspondence of an official nature will be prepared for the signature of the Chief of the Services Section.
* * * 3:
(e) The detail was confirmed, for the 6 months extending from April 3,1958, to October 3,1958, by appropriate request for and approval of personnel action. The detail expired, by its terms, on October 3, 1958, and plaintiff at that time resumed his former place as administrative head of the Unit.
8. (a) On June 4, 1958, plaintiff received a copy of the Employee Performance Appraisal for the period from February 10, 1957, to February 28, 1958. The form had previously been referred (on March 3, 1958) by Major Lawton to the Chief, Industrial Mobilization Office (Purchasing Division) in Chicago for the supervisor’s evaluation of performance of the technical aspects of plaintiff’s work, with advice that the administrative appraisal would be made in Major Lawton’s office.
*84 (b) The official of the Chicago district returned the form with the following comment:
As supervisor of the Production Facility Specialists for Subsistence in the Philadelphia District, who is under the technical supervision of this Headquarters, he has dispatched his duties in an excellent manner by the use of good judgment and tact. He is well regarded by his subordinate.
Pie accepts all assignments willingly that are requested by this Headquarters, and is cooperative and conscientious in the performance of his duties. He has been a part of the Industrial Mobilization Program for subsistence for the past ten years, and has shown his ability of maintaining a continuity of changes that have developed in the planning program during those years. His contacts with management have always been highly regarded by this office. * * *
(c) The performance rating signified on the form was “Outstanding.”[9] The form was signed by Joseph J. Mc-Conville, as supervisor (assistant chief, under Major Law-ton) and contained the following comment by him:
The adjective rating * * * is based on the comments from the Chicago office, * * * and observation by the undersigned supervisor of the rated employee’s performance of his tasks generally with particular emphasis on his Initiative and Adaptability, his Effectiveness in Working With Others, and the Quantity and Timeliness of his work.
9. (a) At the end of October 1958, the job descriptions covering the two Production Facilities Specialists (Subsistence) in the Occupational Rations Unit were again rewritten.[10] One was given Job No. 8470, the other, Job No. 8471. In each instance the former occupational code (GS-1152) was retained, as was the grade (GS-12), but the geographical area was described simply as the “Philadelphia District area,” without breakdown.
(b) Once more the two job descriptions were almost identical, with the following exceptions:
*85 (1) The description of Job No. 8470 did contain, while that for Job 8471 did not contain, the following:[11]
* * * Serves as the focal point between the District and mssa relative to administrative and operational aspects of the program, and relays work assignments to a Production Specialist of equal grade.
(2) The description of Job No. 8471 did contain, while that for Job 8470 did not contain, the following:[12]
* * * Work assignments are relayed to incumbent by Production Specialist of equal grade.
(3) The description of Job No. 8470 did contain, while that for Job No. 8471 did not contain, the following:
5. Provides administrative services and coordinates activities of the Operational Rations Unit: For administrative purposes only, is delegated authority to serve as focal point between the District officials and mssa planning authority on operational ration matters; to receive and distribute work projects; to relay policy and regulatory matter emanating from higher authority to Production Facilities Specialist of equal grade. Confers with Production Facilities Specialist on joint operational matters in order to reach a common understanding or interpretation of policy or procedural changes or determine effect such changes have on program areas assigned. Compiles and submits coordinated recommendations, or replies to correspondence received from higher authority, relative to technical planning matters in respective program areas. Presents coordinated reports relative to work projects, current status of actions, and administrative needs of the subsistence program to District Officials, either orally or in writing, and keeps them apprised of problematic areas encountered and the approach taken to overcome difficulties. Assures that sufficient clerical assistance is obtained to accomplish needs of the program.
(c) In the October 1958 revision, as in previous preparations of job descriptions, care was taken to make the two positions here involved as nearly identical as possible, to the *86 end that both might retain classification in grade 12 rather than have one revert to grade 11.
10. (a) On January 22, 1959, the Chief, Appointments and Control Section, Employee Servicing Branch, of the agency issued to Mr. Partridge a Notification of Personnel Action advising that, effective January 25, 1959, he was reassigned from Job No. 6942 to Job No. 8470.
(b) On the same day (January 22, 1959), the same personnel officer issued to plaintiff a Notification of Personnel Action advising that, effective J anuary 25, 1959, he was reassigned from Job No. 6941 to Job No. 8471.
(c) The end result was, of course, to effect by formal reassignment the exchange of positions as between plaintiff and Mr. Partridge, which had first been tried on a detail basis from April to October 1958.
(d) The reassignment action had been discussed with Colonel Franklin by Colonel Lawton,[13] and Colonel Franklin had authorized Colonel Lawton to proceed with the action.
(e) Meanwhile, at a meeting in Colonel Franklin’s office, on January 20,1959, attended by Colonel Lawton, plaintiff, and Mr. Partridge, Colonel Franklin had told the group that a reduction in force was in the offing; that the loss of one position in the Operational Rations Unit could be a possibility ; and that if such a loss occurred, plaintiff would have to be relocated, since Mr. Partridge had seniority over him.
11. (a) The Notification of Personnel Action described in finding .10 (b) reached plaintiff on J anuary 26, 1959, when he found it on his desk at about 4:30 o’clock in the afternoon, upon his return from the library.
(b) Pie had not theretofore received notice in writing of any such impending action.
(c) The evidence as a whole does not warrant the conclusion that plaintiff was surprised by the reassignment action. On the other hand, there is no affirmative evidence that the action was specifically discussed with him while it was in contemplation and before it became effective. Consequently, he was not given the opportunity prescribed by the regula *87 tions to protest the action and offer reasons why it should not be taken.[14]
12. (a) Upon finding the Notification of Personnel Action on his desk, plaintiff glanced through it hurriedly and then went in search of Colonel Lawton. Being unable to find Colonel Lawton, he went to the office of Colonel Franklin and talked to him about it. While Colonel Franklin testified at the trial that he had no recollection of the conversation, he said he could not deny that it took place; and according to plaintiff’s testimony, Colonel Franklin professed surprise that the action had been taken and suggested to plaintiff that the document be left with him (Colonel F ranklin). Plaintiff further testified that he did leave the document with Colonel Franklin; that it was never returned to plaintiff; and that plaintiff had never again seen either the reassignment order or the job description of Job No. 8471.
(b) On January 27, 1959, plaintiff began an extended period of sick leave. He never again returned to the office.
He had suffered heart damage in 1956, and for some years prior thereto had been afflicted with torticollis, accompanied by a tremor of the head.
He remained on leave from January 27 to June 8, 1959, when his separation from the Service became effective.
13. (a) There followed a series of letters from plaintiff to officials of the agency, begun by plaintiff on January 28, 1959, with a letter to Colonel Franklin. Excerpts from that letter follow:
On Tuesday morning, 20 January, you called a meeting in your office to discuss Subsistence matters. Lt. Col. Lawton, Mr. Partridge and I attended.
You stated that I had been calling on facilities in my district more often than was necessary, presumably because I would rather do that than sit in the office and do nothing. You did not say who had made this accusation, nor did you specify what unnecessary calls had been made.
The next morning I came to your office and asked you who had made these charges, and what specific travel and visits were involved. You did not give me an answer to either question. In the absence of that infor *88 mation I assume that Mr. Partridge — my suB-ordinate, informed Mr. McConville and/or Col. Lawton of what he chose to believe were irregularities, and that Col. Lawton passed such information on to you — without discussing the matter with me. Since it was a blanket accusation I will also assume that the travel in question was the trip I last made — during the week of January 12-16. In answer to that charge a complete report of my activities for that period is attached hereto.
I consider my record for that week to be a very productive one, and I would be happy to have you forward this letter to mssa in Chicago, to whom I am technically responsible, for their opinion of the propriety of my activities.
*****
During the period from 12 to 23 Jan. 1959, while I was making the alleged unnecessary visits and processing the reports, Col. Lawton and Mr. McConville did nothing whatever of a constructive nature for the subsistence program. Mr. Partridge did no work at all, so far as I can discover. However, these three persons (two are my superior officers and one is my sub-ordinate) did connive and conspire during that time to further undermine my position, by formulating false charges against me, and initiating a personnel action which would reassign me to the subordinate position; an action detrimental to me and to the Subsistence Program. This action was never discussed with me, and no reason whatever was given to me for such action. I simply found it on my desk without any information as to who had put it there.
The practice of making broad and unspecified accusations against a person to discredit him, and damage his record is well known and often used by people with low ethical standards. Even though the charges may later be proven false, some of the smear sticks. This sort of thing — used over and over during a long period of time can damage and discredit the best person’s reputation beyond repair. I have been subject to this kind of attack for 4% years, and the attack has been intensified during the last eighteen months. It not only injures me. It injures the whole office and the program we both work for. I no longer have any choice but to utilize every means available to me to end this destructive campaign. I would prefer to deal directly with you to attain that end.
*89 (b) One month later, on February 28, 1959, plaintiff addressed the following memorandum to Colonel Franklin through a subordinate official:
On 20 January, 1959 you advised me that it had become necessary to reduce the force in your offices by one person and that, because it had been determined that one man could do the work of the Operational Rations Unit, I would be riffed. I accepted that decision and considered it a promise of action. Will you please tell me what the effective date of my separation is to be?
I will waive any further advance notice of this action. If it can be made immediate I will appreciate the favor. That would also result in a further saving of money for the Army.
$ $ ‡ $ H*
(c) On March 6, 1959, Colonel Franklin replied to the foregoing, by a letter addressed to plaintiff as “Dear Bob
I have received your letter of 28 February 1959. I am truly amazed at the conclusions you have drawn from the discussion we had on 20 January. I refer to the meeting that I had with you, Mr. Partridge, and Col. Lawton, when I discussed with you, for planning purposes, a possible reduction of personnel in our Branch. I stated at that time that if I determined it necessary to reduce the personnel ceiling of this Branch, the elimination of one space in the Operational Rations Unit could be a possibility. I also stated that if a space were eliminated in the Operational Rations Unit, since Mr. Partridge has seniority in service over you, you would have to be the one relocated.
Tou should be well aware by this time that I have always taken a great personal interest in the welfare of the people in this Branch. The tenor of this discussion was for your general welfare and future.
To date, I have not been informed that this Branch will lose any spaces which are currently filled. I will be most happy to discuss this entire matter with you at your convenience.
(d) On March 15,1959, plaintiff acknowledged receipt of Colonel Franklin’s letter and said in reply:
I have your letter of 6 March in which you say you are amazed at the conclusions I drew from our meeting of 20 January.
*90 When yon told me that you were required to reduce the force in your office by one specialist, that the reduction would be made in the Operational Nations Unit and that it would be me because of Mr. Partridge’s seniority, I concluded that I would be rifled. When you followed that by asking me if I would accept a Grade 11 in Atlanta and offered to call m:ssa in Chicago to see if there were openings there for me, I was sure that my first conclusion was well grounded. What conclusion would you have reached if you had been in my position 1 What is amazing about it?
* * * * *
I am aware of your personal interest in the welfare of people in your office. You can do me a very great favor if you wish to. Biff me now. I assure you that that would be serving my best interests.
If you feel that anything can be gained by further discussion, I will, of course, be available. I suggest that any such discussion should start with my report of 29 October, 1957 in which I recommended a reduction in force and offered to accept a transfer to facilitate the saving. Then I suggest that each false charge made against me since that report, and each penalizing action taken against me, should be examined and the validity or error of each be determined.
14. (a) In early 1959, shortly after New Year’s Day, the depot in Philadelphia received notice that it would lose several hundred civilian spaces by a reduction in force. The Purchasing Division, to which Colonel Franklin’s branch was assigned, was scheduled to lose 40 or more spaces, and Colonel Franklin’s branch was ticketed for 8 civilian spaces. A hiring freeze was put on all vacant spaces throughout the entire depot, with no more hiring of civilian personnel until the full reduction in force had been accomplished. The effect of this action was to accommodate the reduction in force as far as possible by the surrender of vacant spaces, thereby reducing to a minimum the number of employees to be separated. Colonel Franklin was able in this manner to account for five of the eight spaces to be exacted from his branch. One other space in his branch was lost by attrition, when an employee retired. Colonel Franklin therefore had to separate two employees; and plaintiff was one of them.
*91 (b) On May 6, 1959, the Chief, Employee Servicing Branch, Industrial Relations Office, of the agency forwarded to plaintiff formal notice that —
* * * decreased work activities require a reduction in the number of employees in your competitive level. Your name has been reached on the retention register. Therefore, you will be involuntarily separated from the service because of reduction in force. Your last day in an active work status will be 8 Jun 1959 on which date your employment at this installation will be terminated.
(c) The separation notice did not specify the job from which plaintiff was to be separated.
(d) The notice set forth plaintiff’s rights of appeal and review of the separation action, notified him of efforts to locate a reassignment or transfer, and advised him of his status in “Retention Group I Sub-group B, competitive level 12-27 * * * »
(e) On June 6,1959, the official Notification of Personnel Action was forwarded to plaintiff, advising him of his separation from the Service by reduction in force, effective June 8, 1959, and specifying Job No. 8471.
(f) As hereinafter noted, plaintiff believed, upon receiving the reduction-in-force notice of May 6,1959, that he was being separated from Job No. 6941 rather than Job No. 8471. He was under the impression that the action of Colonel Franklin, in asking for and receiving the notice of reassignment and the description of Job No. 8471, had the effect of withdrawing the reassignment for further consideration. He did not realize that he was being separated from Job No. 8471 until he received the notice of June 6,1959.
15. (a) On June 14,1959, plaintiff wrote[15] to the Director, Third Civil Service Region, Philadelphia, appealing the separation action “on the following grounds
‡ $ $ $ $
(A) An order dated 18 June, 1956 * * * established an Operational Rations Unit in the Serv Section and vested administrative control of the unit in me.
*92 My job description, dated 23 January, 1957 which has not been changed since that date, delegates administrative authority in the Operational Rations Unit to me.
It is my contention that these factors outweigh seniority in service and that my subordinate should have been separated in the reduction in force rather than me.
(B) Standard Form 50, Notification of Personnel Action (separation due to reduction in force) dated 6/4/59 is official notice of my separation from Job #8471. I have never had notice of a change in my job to #8471 so I could not be separated from that job. The action is invalid.
(b) On June 30, 1959, the Regional Director of Civil Service in Philadelphia made inquiry of the employing agency concerning plaintiff’s appeal; and on July 30, 1959, the agency’s Industrial Relations Officer replied, stating the limits of the competitive area and forwarding copies of the pertinent retention register and reduction-in-force notice. Civil Service was further advised by the employing agency:
*****
4. No employee with lower retention standing than the appellant was retained in the competitive level.
5. A list of all lower ranking employees, identified with their competitive levels, is attached. The appellant is not qualified in any of these levels. His experience is confined to the subsistence field.
6. A complete listing of the positions held by the appellant, reflecting his progress in government service, is attached.
7. In response to the appellant’s claim that he never had notice of a change in his job to #8471, a copy of the Standard Form 50 reassigning him to that job is attached.
8. This reduction-in-force action was brought about due to the abolishment of the position, necessitated by a reduction of spaces in accordance with Personnel Authorization Voucher 59-44, Military Clothing and Textile Supply Agency, Philadelphia Quartermaster Depot, dated 6 March 1959.
* * * * *
(c). On August 5, 1959, the Acting Regional Director of Civil Service, Philadelphia, wrote plaintiff:
* * * Our study of your case does not * * * indicate that your rights under the rules and regulations governing reductions in force have been violated.
*93 The records show that you were listed correctly on the retention register, were properly reached for reduction in force, and received proper notice to that effect. Further, our review showed no position to which you have a right to assignment in the competitive area of the Military Clothing and Textile Supply Agency, Philadelphia Quartermaster Depot.
We have been informed by your agency that the reduction in force action affecting you is the result of abolishment of your position, necessitated by a reduction in spaces authorized to the Depot. Related to the abolishment of your position is the contention in your appeal that you had never received notification of a change in your job number to job #8471 and, therefore, could not be separated from that job. Official records in your personnel folder show that a Standard Form 50 was executed on January 25,1959, recording the change in your position number from 6941 to 8471. The employee copy of the Standard Form 50 should have reached you. However, there was no change made in your official position title or grade by reason of the change in job number and your standing on the competitive level for Production Facilities Specialist, GS-12, prior to January 25, remained unchanged by the change in job number. * * *
No further appeal from this decision will be entertained unless it is submitted to the Board of Appeals and Review, U.S. Civil Service Commission, Washington 25, D.C., within seven (7) calendar days after receipt of this decision. Additional representations should be made in writing and submitted in duplicate with the appeal. * * *
16. (a) On August 13, 1959, plaintiff appealed to the Civil Service Board of Appeals and Review,[16] stating, in pertinent part:
* * * * *
Standard Form 50, Notification of personnel action, dated 6/4/59 is official notice of my separation from job No. 8471. I had never been officially assigned to that job so I could not be separated from it, consequently the action was invalid.
*94 My appeal is based on the fact that the Third Ke-gional Office reached their negative opinion as a result of fallacious reasoning in that they considered what “should have” been done rather than what actually “was done”. * * *
* * * * *
* * * I was never told by anyone that my job number and description had been changed or was being changed.
* * * * *
The Form 50 dated 6/4/59, Notice of Separation, is invalid. My Job No. was and is 6941. I request that the notice of separation dated 6 May, 1959 be rescinded in that it is predicated on an invalid action, that I be tendered reinstatement in my status as of 3 May, 1959 and paid in full for the period from 8 June, 1959 to the date of my reinstatement.
(b) On September 18,1959, the Civil Service Commission directed Departmental Circular No. 1019 [17] to heads of departments and independent agencies. The text of the Circular follows:
In deciding the case of Watson v. United States, 162 F. Supp. 755, the United States Court of Claims held that the procedural regulations of an agency issued pursuant to statutory authority have the force and effect of law and must be complied with by the agency that issued them. Copies of the Watson decision were sent to all agencies by Departmental Circular No. 747, Supplement No. 5, dated June 19, 1958.
In Departmental Circular No. 990, the Commission noted that it already took into account an agency’s substantive requirements in judging an appeal from an adverse action on its merits. For example, the standards of performance or conduct prescribed by the employing agency may be pertinent in determining the appeal of a veteran discharged for misconduct. The Circular distinguished these matters from agency procedural requirements, which the Commission announced it would not enforce.
The Commission has since reviewed the latter determination and concluded that it should be changed in the interest of more timely resolution of employee rights and in view of the interest of the Courts in these matters. Therefore, allegations that procedural requirements of *95 ail agency were not followed in taking an adverse personnel action will be considered by the Commission on appeal.
More specifically, where Commission regulations now provide for an appeal by an employee from an adverse agency action, the employee may appeal to the Commission from an alleged violation of agency procedural regulations. Such an allegation may be the sole basis for the appeal or may be made in conjunction with an alleged violation of Commission regulations. An appeal that alleges violation of agency procedural regulations must:
—relate to an adverse action covered by Commission regulations (this would include such actions as removals, demotions, and suspensions, but not matters such as reprimands or non-promotion).
—involve one of a class of employees entitled to appeal the adverse action imder Commission regulations (this would include such classes as career, career-conditional, and non-temporary appointees with veteran preference, but exclude temporaries and non-veterans in excepted positions).
—be submitted to the Commission within the time limits provided by Commission regulations (Parts 9, 20, and 22, normally require an appeal to be submitted within ten days after the adverse action).
When it is found that an authoritative written agency requirement was not followed in taking the adverse action and this materially affected the appellant’s rights, the Commission may reverse the action as procedurally defective.
This revised policy does not lessen agency responsibility for compliance with, or enforcement of, its own requirements.
The revised policy is effective with respect to appeals under consideration on the date of this Circular or received on or after that date.
* * * * *
(c) On November 2, 1959, plaintiff wrote[18] to the Chairman of the Board of Appeals and Review of the Civil Service Commission:
I called at the Civil Service Office this morning and discussed my pending appeal with Mr. James Norris. * * *
*96 It is my contention that the alleged reassignment action dated 25 January, 1959 was stayed by Lt. Col. George Franklin, my superior officer, when he professed complete ignorance of the matter and asked me to give Trim the papers for his study. When he obtained _ the documents for study the action was suspended until he approved or disapproved. No decision has ever been reached so far as I know. Until he does approve the action I am still officially in Job No. 6941.
* * * * *
Mr. Norris said that, in his opinion, the fact that I found the contested Form 50 on my desk constituted proper notice of reassignment, whether I knew who had left it there or not and whether my superior officer, Col. Franklin, knew that it had been processed or not. Mr. Norris further contends that, because the document was in my hands for a period of fifteen minutes, proper notice had been accomplished. * * *
It is my contention that an adverse official action affecting my position and welfare should be handed to me just as is required in any legal action. I do not know yet who initiated the action nor who put it on my desk. I can guess but I do not know. The blank documents are easily obtainable and any one of several hundred people could have typed this up and put it on my desk.
* * * * *
I am sure that when Col. Franklin professed ignorance of the action and asked me to give him the documents, he was acting in good faith and obviously intended to investigate the matter before approving it or disapproving it. His request could have one of only two meanings. Either he wanted to study the case for later decision or he was withdrawing the action. If he had approved the action he would have told me to keep the documents because they were effective then. While he was investigating the action it was suspended and obviously not in force, hence, until I am notified of his decision, my official position is the job designated as No. 6941.
* * * * *
I believe that Lt. Col. John Lawton initiated this action. I also believe that regulations require that reassignment can be made when it can be shown it is for the good of the service. I have not been informed of any reason whatever for the reassignment and I do not believe it was stated on the document. Col. Lawton was in the process of transfer to another office in the depot *97 where he would not be responsible to Col. Franklin. I believe that Col. Lawton initiated the action at the exact moment he was leaving Col. Franklin’s supervision, knowing that Col. Franklin had told me that I would not be reassigned again, and knowing he would be immune to a charge of insubordination in that he would be removed from Col. Franklins area of authority. I believe the action was knowingly malicious and was initiated for the purpose of embarrassing Col. Franklin and me.
* * * * *
(d) On November 10, 1959, plaintiff again wrote to the Chairman of the Board of Appeals and Review:
Further evidence to support my appeal and contention that the reassignment action involving me dated 25 January, 1959 was not valid is presented here.
The type of action taken was an Involuntary Reassignment because I had no choice in the matter. The document was dated 24 January, 1959 and the effective date was specified as 25 J an., 1959. I had no knowledge of the contemplated action before it was placed on my desk at 4:30 P.M. 25 January. At that time it was already in effect, according to decision reached in the 3rd C. S. Regional Office.
Your attention is invited to Dept, of the Army Civilian Personnel Regulation (CPR) NI.5, C-2, Section 5, Para. 5-2 and 5-2a, dated 13 December, 1957. A copy of the regulation is enclosed.
* * * * *
(e) Three days later, on November 13,1959, plaintiff further wrote to the Chairman of the Board of Appeals and Review:
Yesterday I talked with Mr. Norris, in your office, in regard to my appeal. Mr. Norris referred, several times, to what he felt was lack of diligence on my part in pressing my protests. In respect to this I offer the following facts and wish to have them made part of the record.
At 4:30 P.M. on 25 January, 19591 found the contested reassignment document on my desk. At 4:45 P.M. I protested the action. That is just fifteen minutes delay. Lt. Col. Lawton, my immediate superior officer, was not in the office at the time. I took my protest to Lt. Col. Franklin, next higher officer in the chain of command, which was according to Agency regulation.
On or about 12 June, 1959 I received, at San Mateo, Cal., a Form 50 Notice that I had been separated from *98 Job No. 8471. On 14 June I wrote to the Third Regional Office appealing the action. That is two days alter receipt of the notice.
On or about 10 August, 1959 I received notice from the Third Regional Office that an adverse decision had been reached and that I had seven days in which to appeal to your Board. On 13 August I wrote to your office of my appeal. That is three days. These are the official actions I have taken and I do not believe that the alleged inadequate diligence can be shown.
I did not appeal the letter notifying me of my separation because my job had been abolished, for the reason that I thought my job had been abolished, as stated, and that the separation was in order. I did not know, until I received the Form 50 Official Notice on 12 June, that my job had not been abolished and that, in effect, the notice informed me of my separation from a position I had never occupied.
* * * * *
Mr. Norris also indicated that he was not convinced that the Commission is responsible for Agency violations of CPRs. It is my understanding that the U.S. government authorizes and requires the Civil Service Commission to regulate and administer affairs of Civil Service employees. The commission can and does delegate authority to the various Agencies to formulate regulations for this purpose, within limits, and in accordance with policies established by law and by the Commission. It has been my understanding that the Commission cannot delegate its responsibility for its basic functions to its agents.
(f) On November 27,1959, the Chairman of the Board of Appeals and Review wrote to plaintiff:
Reference is made to your appeal from the decision of the Third Civil Service Region which sustained the action of the Philadelphia Quartermaster Depot whereby you were separated on June 8,1959 from the position of Production Facilities Specialist (Subsistence), GS-1152-12, as the result of reduction in force.
The evidence in your appeal file establishes that you were in retention subgroup I-B with 11 retention credits and that on the basis of your retention standing in the competitive level of Production Facilities Specialist (Subsistence), GS-1152-12, you were properly within reach for reduction-in-force action. The notice of the adverse action is found to have been both timely and *99 adequate and in accordance with, the provisions of the Betention Preference Begulations. The evidence in your appeal file further establishes that there were no other continuing positions at the Philadelphia Quartermaster Depot to which you had a regulatory right of reassignment.
The principal contention in your appeal is that you had never been officially assigned to the position identified as No. 8471, the position from which you were separated, and hence your separation from that position must be regarded as invalid.
In recent letters supplementing your original appeal, it is your contention that no true delivery of a notice of position change occurred on January 25, 1959, even though you had in your hands on that date a Standard Form 50, labeled as a reassignment from position No. 6941 to Position No. 8471, because you immediately surrendered the document to your supervisor who indicated that he had no knowledge of such an action and said he would look into it. It is your position that since you were not further advised by your supervisor of the reassignment, the action of January 25, 1959, must be regarded as suspended.
The Board does not concur in your contention. The evidence establishes that the agency properly issued a Standard Form 50 on January 25, 1959, reflecting a reassignment from Position No. 6941 to Position No. 8471, with no change in the title, grade, or classification series of your position. The evidence further establishes that you duly received a copy of the Standard Form 50 reflecting such change. The Board finds no merit in the proposition that the validity or accomplishment of the personnel action represented by the notification form was destroyed or in any way affected by your voluntary action in immediately surrendering the notification to your supervisor.
Other evidence in the appeal file, more relevant to the reduction-in-force aspects of your case, establishes that the position from which you were separated was fundamentally the same position you held prior to January 25, 1959,_ the date you. received notice of a change in your position. The position from which you were separated on June 8, 1959, was listed, for reduction-in-force purposes, in competitive level 12-27. Tour position had been listed in competitive level 12-27 since February 28, 1958, when the retention register bearing your name and that of Mr. Charles E. Partridge was prepared. This evidence establishes that your position has, for reduc *100 tion-in-force purposes, remained unchanged since February 28,1958, irrespective of the renumbering of your job sheet on January 25,1959 or of any revision of your duties and responsibilities as you have alleged.
In the light of the evidence in your appeal file, which has provided the Board with sufficient information to make an adequate decision without further inquiry, and in view of the above analysis, there being no evidence that the Retention Preference Regulations were violated in your case, the Board of Appeals and Review affirms the previous decision of the Third Civil Service Region.
17. (a) Plaintiff thereafter petitioned the Civil Service Commission for review of the decision by the Board of Appeals and Review. The following excerpt from his appeal letter of December 16,1959, is pertinent to other facets of tli6 case, hereinafter noted:
In respect to the valid procedural provision for employee opportunity to reply and give reasons why he should not be reassigned, the following information is pertinent:
Duties in the position to which I was being reassigned involved additional travel time substantially above and beyond the heavy travel duties already assigned to me. It is a matter of record at the Philadelphia QM Depot, and in the Commission, that, for physical reasons, I could not perform additional travel duties. In failing to give me opportunity to give this as a reason I should not be reassigned the Agency deprived me of rights accorded me in the above referenced CPR. This was one of several factors making the reassignment an adverse action.
(b) On February 13, 1961, after an exchange of correspondence between plaintiff and various officials of the Civil Service Commission, plaintiff was advised that his administrative remedies had been exhausted when the Board of Appeals and Review affirmed the decision of the Third Regional Office, and that he had “no enforceable right to further consideration * * * within the Commission.”
18. (a) On December 14, 1959, plaintiff filed application with the Civil Service retirement system for retirement based on disability. In the application he asserted that he became totally disabled on January 26, 1959, and described his disabilities as follows:
Parkinsonism and torticollis — progressive since 1942. *101 Heart damage incurred in accident while on official business, in Hagerstown, Md. on 1/9/56. Fell on icy curb and fractured three ribs and heart infarction. Duties include over 30% travel by auto. Unable to continue long hours of driving because of strain and tension.
(b) In connection with the application, plaintiff’s physician certified on September 18,1959:
Patient suffered heart damage in 1956. Has had stiffness of his neck and shaking of head for 15 years.
Totally disabled from his present occupation— 1/26/69.
Patient has torticollis with a gross tremor of the head. Electrocardiogram shows a possible old posterior myocardial infarction. Increase in blood pressure since heart damage in 1956. The patient’s duties included over 30% travel time, mostly by automobile. Fatigue and tension resulting from long hours of travel aggravate the Parkinson and the heart condition. Moderation in all activities is prescribed.
(c) The application was approved, and his disability retirement was made effective as of June 9,1959. He has been paid disability retirement benefits at the rate of $153 per month since that date.
19. (a) On March 20,1961, plaintiff was employed by the Small Business Administration (Charlotte Branch Office of the Richmond Regional Office) on the basis of “Reinstatement (Career) (Reemployed Annuitant) ” in the position of Industrial Specialist (General Procurement), grade GS-12, salary $10,255 per annum “ (less annuity of $1836).”
(b) Plaintiff was still so employed at the time of trial. He has received at least four commendations in the pei'f ormance of his duties with SB A.
20. It is not established by the evidence that plaintiff has been able, at any time since January 26, 1959, to perform the duties of his former position with the employing agency, or of any similar position requiring substantial travel.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and the petition is dismissed.

A detail is a method of effecting reassignments on a strictly temporary basis.

 Major Lawton bad been promoted to lieutenant colonel in July 1958.

 Colonel Franklin testified that be had no recollection of a conversation with plaintiff concerning the reassignment; however, he said that he could not deny that it took place.

 Plaintiff is a citizen of the united States, being a native of Richmond, Virginia. He was born on March 6, 1901. At the time of action filed, he was living in Charlotte, North Carolina.

 His entrance grade was CAP — 11, at a salary of $5,232 per annum.

 The parties have stipulated that Ms appointment in the classified civil service dates from February 10, 1957.

 Plaintiff held this grade when he entered upon Job No. 6941 on February 10, 1957.

 At the trial, by agreement of counsel and with the approval of the commissioner, trial was limited to issues of fact and law pertaining to plaintiff’s right to recover.

 The Philadelphia Quartermaster Depot, Department of the Army.

 The letters "mssa" stood for "Military Subsistence Supply Agency."

 CPR N1.5 C 2, Par. 5-2.

 The parties have stipulated that plaintiff’s performance iras Satisfactory at all times material to this action.

 The restatement of the job descriptions was part of an agency-wide undertaking to unify and coordinate jobs.

 The quoted language appeared at the end of the second paragraph of the description of Job No. 8470.

 The quoted language appeared at the end of the first paragraph of the description of Job No. 8471.

 Major Lawton Rad been promoted to the rank of lieutenant colonel in July 1958.

 See finding 6.

 The letter was sent from San Mateo, California, where plaintiff was then living. Considerations of health had been among his reasons for moving from Pennsylvania to California.

 He had received the Regional Director’s letter on August 11, 1959.

 This Circular superseded Departmental Circular 990.

 This letter was written from Alexandria, Virginia, where plaintiff was then living.